**In re James Philip SLETTELAND, Debtor.**

**No. 99–44667(ALG).**

United States Bankruptcy Court, S.D. New York.

March 28, 2001.

Satterlee Stephens Burke & Burke LLP (Timothy T. Brock, Bernard M. Althoff, of Counsel), New York City, for Debtor.

Windels Marx Lane & Mittendorf LLP (Charles E. Simpson, of Counsel), New York City, for Movants.

## MEMORANDUM OF DECISION AND ORDER

ALLAN L. GROPPER, Bankruptcy Judge.

The individual debtor and debtor in possession in this Chapter 11 case, James Philip Sletteland (the "Debtor"), is engaged in the business of developing and investing in electrical power generating plants and providing consulting services to the energy and waste management industries. In a wholly unsuccessful foray into the legal arena, he brought a derivative action on behalf of an energy company in which he is a 20 percent owner against two of his fellow investors and shareholders and ended up owing them and a third shareholder more than $3,000,000 on their counterclaims. As a direct consequence he also ended up as Debtor in this Chapter 11 case.

Before the Court is the motion of the counterclaim plaintiffs, Owen Orndorff, R. Lee Roberts and Jeffrey L. Smith (the "Shareholder Group"), to dismiss this Chapter 11 case on the ground that it was filed in bad faith. In the alternative, the Group seeks to appoint an examiner with expanded powers and to terminate the period during which the Debtor has the exclusive right to file a plan. That period has been extended four times; the last extension was granted with leave to the Group to seek to terminate exclusivity for cause.

Determination of the motion requires a more detailed explanation of the background facts.

*The Debtor's Business Interests*

The Debtor and the Shareholder Group have ownership interests in two entities, Billings Generation, Inc. ("BGI") and Rosebud Energy Corp. ("Rosebud"). The Debtor holds interests in BGI and Rosebud of 20% and 25%, respectively, compared to the Shareholder Group's 80% and 75% interests. In turn BGI and Rosebud are general partners owning, as to BGI, a 35% interest in Yellowstone Energy Limited Partnership ("YELP"), and as to Rosebud, a 50% interest in Colstrip Energy Limited Partnership ("CELP"). YELP and CELP are electrical cogeneration power plants in Montana, one of which is currently generating revenues and one of which is not. The members of the Shareholder Group are the officers of BGI and Rosebud, having removed the Debtor as an officer; he remains a minority shareholder and a director of each entity.

*The Montana Litigation*

The chain of events leading to the present motion began when the Debtor and the then remaining minority shareholder in BGI, Ronald D. Blendu, brought a shareholder derivative action on behalf of BGI against Messrs. Roberts and Orndorff and BGI (as a nominal defendant). At

issue in the action were legal fees charged by Orndorff and Roberts to YELP. It was alleged that the payments to Orndorff and Roberts had not been approved by BGI or by shareholder or director action, that the legal fees were excessive and that the charge of fees created a conflict of interest and constituted self-dealing. The complaint sought a return of legal fees and removal of Orndorff and Roberts from the board of directors of BGI.

A counterclaim was filed by the defendants, joined by Jeffrey Smith, the third member of the Shareholder Group, alleging that the Debtor had breached his fiduciary duty to the corporation by filing the derivative suit, as it allegedly had the direct effect of precluding a needed refinancing of the YELP Project. At the time of the filing of the derivative suit YELP and BGI were negotiating with their lender to restructure the financing. It was also alleged that the Debtor had engineered the suit for ulterior purposes to force a buyout of his position.

The Montana District Court determined in an opinion dated March 26, 1997, that there was a conflict of interest which was not properly waived, that the hourly rates charged by Orndorff and Roberts were excessive and that approximately $370,000 in fees should be disgorged. On the counterclaims, however, the court found that Sletteland had breached his fiduciary duty to the shareholders of the corporation by commencing the suit at a time the company was seeking badly needed financing from a third party, that the Debtor had done so either intentionally or negligently, and that he had injured the Shareholder Group in the amount of $3,027,939.[1] There is no dispute that the Debtor was unable to pay or to bond the judgment entered against him and that he filed a Chapter 11 petition in this Court as a direct result thereof.

On November 17, 1999, the Debtor moved for relief from the automatic stay so as to permit him to appeal to the Montana Supreme Court. The members of the Shareholder Group did not object to the Debtor's appeal but sought relief from the stay to cross appeal from the Montana District Court's grant of judgment against them on the derivative claim. An order was entered on December 9, 1999, permitting both the appeal and the cross appeal to go forward in the Montana Supreme Court; the order placed no conditions on the appeal that are relevant to these motions. Recently, after the instant motions were briefed but before argument, the Montana Supreme Court decided the appeal, and again the Debtor was unsuccessful. In an opinion dated December 28, 2000, the Supreme Court of Montana affirmed the $3 million judgment against the Debtor but reversed the decision of the District Court with respect to the fees of Orndorff and Roberts, finding that these charges were reasonable and appropriate and directing judgment in their favor on the complaint.

*The Shareholder Group's Motion in the Instant Bankruptcy Proceeding*

In support of its motion to dismiss, the Shareholder Group relies principally on the argument that the Debtor filed this case in "bad faith," specifically as a means to avoid execution on the Montana judgment and the posting of a supersedeas bond in Montana. The members of the Group argue that the Debtor's principal assets are his interests in BGI and Rose-

1. Ronald Blendu, the fifth investor in BGI, joined in the shareholder derivative suit initially but settled with the counterclaimants prior to entry of judgment. In a separate lawsuit in Idaho, the Debtor is now seeking contribution from Blendu for part of the $3,000,000 judgment against him.

bud, that he apparently has little revenue other than his distributions from Rosebud, and that, as a minority shareholder in BGI and Rosebud, he has no control over the entities and will never be able to propose and fund a plan utilizing these assets, making this case a nullity. They point out further that the litigation is generating large administrative expenses which have priority over the claims of unsecured creditors, *e.g.,* their claims, as there are virtually no other unsecured creditors in this "two party" case. They also speculate as to wrongdoing the Debtor might commit during the course of this case as justifying dismissal or the appointment of an examiner with the expanded powers of a trustee.

The Debtor has, other than the Shareholder Group, few if any creditors. His amended schedules show two unsecured holders of credit card debt of only about $5,000, mortgages on one of his two residences totaling $667,637, and a life insurance policy loan of $110,000. Other than the Shareholder Group the only creditor to have appeared on the instant motion is Exxon Billings Cogeneration, Inc. ("EBCI"), the limited partner in YELP. EBCI holds a pledge of the Debtor's distributions from and shares in Rosebud, which secures the Debtor's contingent obligations under a guarantee of EBCI's financing of the YELP plant. EBCI has taken a neutral position between the Debtor and the Shareholder Group, but its counsel stated on argument of the motion that it does not support summary dismissal of this case. The Debtor's rights in BGI are also pledged and subject to restrictions imposed in connection with the financing of that project.

The Debtor's schedules show that his principal assets are his interests in BGI and Rosebud. As noted above, he does have a claim for contribution in respect of the $3,000,000 judgment against the fifth shareholder in BGI and Rosebud, but the claim is in litigation and of uncertain value. The schedules also show limited equity in one of his residences, some cash and receivables, several limited investment accounts, and some property interests that are unvalued. In any event, it is the position of the Shareholder Group that, "the value of the Debtors' liabilities far exceed the Debtor's assets. *The Debtor is insolvent.*" (emphasis in original). For his part the Debtor argues that he has business assets that should be protected and insists that his interests in BGI and Rosebud, if marketed properly, are worth in excess of the judgment against him and/or can form the basis for a confirmable plan. He has consistently stated that it is his purpose to reorganize and file a confirmable plan.

*The "Bad Faith" of a Debtor in Filing Under Chapter 11 to Avoid the Effect of a Crushing Judgment*

Many decisions have considered whether to dismiss a bankruptcy petition, grant similar dispositive relief or award sanctions on the basis of the alleged "bad faith" of the debtor in seeking to avoid the effect of litigation in another court. In *In re Cohoes Industrial Terminal, Inc.,* 931 F.2d 222 (2d Cir.1991), the Second Circuit considered the issue in connection with an award of sanctions against a debtor's attorney for an alleged bad faith filing. The court held that a filing could be considered frivolous if there were "no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings," equating lack of "demonstrable intent to reorganize" with "bad faith" 931 F.2d at 227. But the court held there that a case, whose admitted purpose was to attack a State court judgment collaterally and to obtain related respite from creditor demands, was not filed in bad faith if the debtor had "some intention of reorga-

nizing." *Id.* at 228. The court said, "Filing a bankruptcy petition with the intent to frustrate creditors does not by itself 'establish an absence of intent to seek rehabilitation,'" *Id.* at 228 quoting *Banque de Financement, S.A. v. First National Bank of Boston,* 568 F.2d 911, 917 (2d Cir.1977). It also noted Collier's conclusion that, "In reality, there is 'a considerable gap between delaying creditors, even secured creditors, on the eve of foreclosure and the concept of abuse of judicial purpose.'" *Id.* at 228. It was not determinative that at the time the petition was filed, the debtor had only three unrelated unsecured creditors. *Id.* at 229.[2]

The Second Circuit again examined the question of a good faith filing in *In re C–TC 9th Avenue Partnership,* 113 F.3d 1304 (2d Cir.1997). On a motion to dismiss the court found that a partnership in dissolution had filed under Chapter 11 solely to frustrate the "legitimate efforts" of a secured party to foreclose on the debtor's only asset, that the debtor had not paid its property or other taxes, and that the debtor had taken no other action in the case for more than a year after the filing. *Id.* at 1312. The Court of Appeals held that the Bankruptcy Court did not abuse its discretion in dismissing the case where "on the filing date there was no reasonable likelihood that the debtor intended to reorganize and no reasonable probability that it would eventually emerge from bankruptcy proceedings." 113 F.3d at 1309, quoting *In re Cohoes,* 931 F.2d at 227.

■ While *C–TC 9th Avenue Partnership* takes a less favorable view than *Cohoes* of a Chapter 11 filing that responds to State litigation, the critical issue in both cases is whether there was, on the date of the filing, a good faith intent to reorganize and a lack of any intent to use the bankruptcy process solely as a means to delay, frustrate and relitigate State court issues. As will be seen below, the Shareholder Group has not demonstrated on this motion that this Debtor lacked a good faith intent to reorganize on the date he filed this case or that he intended to use to this Court simply as a mechanism for frustrating their efforts to gain the fruits of their litigation. However, neither *Cohoes* nor *C–TC 9th Avenue Partnership* considered how the judgment debtor's intent to pursue an appeal of the adverse judgment without filing a bond bears on the issue of good faith, if at all.

Many other judges have considered this issue, including in *dicta* three Justices of the Supreme Court in the largest Chapter 11 case of all time. *Pennzoil Co. v. Texaco Inc.,* 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), involved a $11.2 billion dollar judgment against Texaco, Inc. in the Texas State courts. In the words of one of the many opinions in the subsequent Chapter 11 case, the filing was "solely in order to gain the benefit of the automatic stay provisions of the Bankruptcy Code § 362, and to prevent Pennzoil [the judgment creditor] from perfecting judgment liens on its property, or collecting the judgment prior to appellate finality..." *Kirk v. Texaco,* 82 B.R. 678, 679–80 (S.D.N.Y.1988); *see also In re Texaco Inc.,* 76 B.R. 322 (Bankr. S.D.N.Y.1987). The Texaco Chapter 11

2. Many cases hold that courts should dismiss on bad faith grounds sparingly. *See, e.g., Carolin Corp. v. Miller,* 886 F.2d 693, 694 (4th Cir.1989) (case could be dismissed "with great caution and upon supportable findings both of the objective futility of any possibility of reorganization and the subjective bad faith of the petitioner in seeking this form of bankruptcy protection."); *In re Johns–Manville Corp.,* 36 B.R. 727, 737 (Bankr.S.D.N.Y.1984) (dismissal on bad faith grounds should be granted sparingly and on a clear showing of abuse of the bankruptcy process, avoiding an "intense focus on the debtor's motives in filing."); *In re 234–6 West 22nd St. Corp.,* 214 B.R. 751, 757 (Bankr.S.D.N.Y.1997).

filing followed not only the $11.2 billion jury verdict but also an injunction that was issued by the U.S. District Court for the Southern District of New York, 626 F.Supp. 250, modified by the Second Circuit, 784 F.2d 1133, preventing Pennzoil from executing on the judgment during the course of Texaco's appeal; the injunction was vacated by the Supreme Court. 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1. Three justices of the Supreme Court who concurred in the lifting of the injunction stated in *dicta* that Texaco could obtain the stay of enforcement it was seeking in bankruptcy court by virtue of § 362 of the Bankruptcy Code.[3]

The two Circuit Court decisions on this point have been less receptive to Chapter 11 filings to "avoid" filing a bond. In *Matter of Little Creek Development Co.*, 779 F.2d 1068 (5th Cir.1986), the Fifth Circuit remanded for further findings in light of the *sua sponte* action of the Bankruptcy Court in summarily granting the debtor's principal creditor relief from the automatic stay for "cause," *i.e.*, the debtor's bad faith in filing when unable to post a bond against an adverse State court decision. The court said, "Determining whether the debtor's filing for relief is in good faith depends largely upon the bankruptcy court's on-the-spot evaluation of the debtor's financial condition, motives, and the local financial realities." 779 F.2d at 1072. But it gave as one example of a possible bad faith filing where "the debtor and one creditor may have proceeded to a stand-still in state court litigation, and the debtor has lost or has been required to post a bond which it cannot afford." *Id.* at 1073; *see also In re Marsch*, 36 F.3d 825 (9th Cir.1994), discussed below.

In connection with an "evaluation of the Debtor's financial condition; motives and the local financial realities," courts have considered the following factors as bearing on the debtor's good faith and as important in deciding a motion to dismiss a Chapter 11 filing in the face of a judgment that the debtor seeks to appeal.

1. *Ability to Post a Bond and/or Pay the Judgment*

Courts have frequently dismissed on bad faith grounds if the Chapter 11 debtor was able to pay the judgment or post a bond. In *In re Marsch, supra*, 36 F.3d at 827, the Bankruptcy Court had found that the debtor, who was not in business, had sufficient assets to pay the judgment or post the bond. The Court of Appeals commented that it would leave open the question whether a Chapter 11 petition could be used to delay collection of a judgment and to avoid filing an appeal bond "when enforcement of a judgment would cause

3. Justices Brennan and Marshall said in their concurring opinion:

"Texaco clearly could exercise its right to appeal in order to protect its corporate interests even if it were forced to file in bankruptcy under Chapter 11. 11 U.S.C. § 362. Texaco, or its successors in interest, could go forward with the appeal, and if it did prevail on its appeal in Texas courts, the bankruptcy proceedings could be terminated. 11 U.S.C. § 1112. Texaco simply fails to show how the initiation of corporate reorganization activities would prevent it from obtaining meaningful appellate review." 481 U.S. at 22, 107 S.Ct. 1519. Justice Stevens expressed a similar view. 481 U.S. at 32, n. 6, 107 S.Ct. 1519. Justice Blackmun, who also concurred separately, thought that the notion that Texaco could enter Chapter 11, pursue its appeal and then reemerge was "somewhat at odds with the corporate reorganizations that might occur in bankruptcy," but he did not suggest there was a good faith issue. *Id.* at 28, 107 S.Ct. 1519, n. These remarks are *dicta*, but they may have been persuasive; there was never a litigated motion in the *Texaco* case to dismiss on bad faith grounds.

severe business disruption." *Id.* at 829. But since the individual debtor was not involved in a business venture and had "the financial means to pay the judgment, immediate dismissal was the only appropriate course," and the Bankruptcy Court had erred even in giving the debtor a 60–day stay in order to "conduct an orderly liquidation." *Id.* at 829; *see also In re Smith,* 58 B.R. 448 (Bankr.W.D.Ky.1986); *In re Davis,* 93 B.R. 501 (Bankr.S.D.Tex. 1987); *In re Boynton,* 184 B.R. 580, 583 (Bankr.S.D.Cal.1995); *In re Fox,* 232 B.R. 229 (Bankr.D.Kan.1999).[4]

2. *Action to Transfer Assets or Place Them Beyond the Reach of Creditors.*

This is a core reason for finding a debtor in bad faith, whether or not the debtor is seeking to avoid the effects of a judgment, and it may have been the decisive factor in many of the decisions. *See, e.g., In re Edwards,* 140 B.R. 515, 520 (Bankr. W.D.Mo.1992), where the court dismissed after finding that the debtor had transferred assets on the eve of bankruptcy, and had "no evidence of any realistic potential for reorganization," as it was effectively prohibited from engaging in business by a State court injunction and did not have a sufficient level of business to support a plan otherwise; *In re Primary Health Services, Inc.,* 227 B.R. 479, 485–486 (Bankr.N.D.Ohio 1998), where the question of good faith arose in connection with a creditor's motion for attorneys' fees or sanctions against the debtor, and the court held that the debtor had "transferred assets away from itself to its parent company for the purpose of making itself uncollectible" and that "absent the transfers made by the debtor after the state court rendered its judgment, the debtor would have remained solvent."

3. *Case is a Two–Party Dispute Between the Debtor and the Judgment Creditor; Debtor has no Employees or Ongoing Business.*

Whether the debtor has a business to reorganize has been an important factor in many cases. In *In re Marsch, supra,* the Circuit Court was willing to leave open the possibility that a Chapter 11 filing could be sustained as in good faith "when enforcement of a judgment would cause severe business disruption." 36 F.3d at 829. In *In re Clinton Centrifuge, Inc.,* 72 B.R. 900 (Bankr.E.D.Pa.1987), the court, after a full review of the factors used in determining bad faith and after considering the purpose and goals of Chapter 11, found that "Prior to the filing, the debtor had an ongoing business with several employees and several creditors other than the movants. The debtor's continued viability has been threatened by the claim successfully asserted in state court ... In these circumstances, and on this record, there is no basis to conclude that the case was filed 'with demonstrable frivolous purposes absent any economic reality,' or that 'reorganization process is being perverted in this case.' " 72 B.R. at 908 (citations omitted).

In an early case, *In re Alton Telegraph Printing Co.,* 14 B.R. 238 (Bankr.S.D.Ill. 1981), the court found that the debtor had published a newspaper for more than 100 years, employed a substantial number of people, and was a "viable business," but was in need of financial rehabilitation in light of the enormous judgment that had

4. In *In re Fox,* the court declined "to adopt a *per se* rule that filing a bankruptcy as a substitute for posting an appeal bond always constitutes bad faith." It agreed "with those cases that look to the circumstances of the case, including whether or not the debtor could afford to post such a bond." But it concluded, "The focus of this inquiry should be on whether the debtor had the ability to post the bond without losing the ability to stay in business." 232 B.R. at 234 (footnote omitted).

been obtained by one plaintiff and the pendency of other libel cases against it. It concluded that the debtor was "forced into filing a bankruptcy petition in order to preserve its status as an ongoing concern and protect its employees and its creditors while the claims against it are litigated", and that the filing was in good faith. Id. at 241.[5] The court in *In re Sparklet Devices, Inc.*, 154 B.R. 544 (Bankr.E.D.Mo. 1993), concluded that "in those cases in which a court has permitted a Chapter 11 filing as a functional equivalent of a supersedeas bond, one of two standards was met: (1) a multinational company faced mass tort litigation; or (2) a large judgment would force the debtor to close its business and liquidate. In both lines of cases, however, the crucial element to the finding of good faith has been the fact that the Debtor was an on-going concern with employees and the means to reorganize." *Id* at 548–49. In that case, the court dismissed the petition, finding that the filing was merely to delay the "legitimate efforts" of the estate's largest creditor.

4. *Debtor Has Not Exhausted its State Remedies in Attempting to Appeal Without Posting a Bond; Availability of Alternatives to Bankruptcy Filing*

Several courts have been influenced by the possibility that the debtor might be able to appeal without posting a bond or with a limited bond. *In re Harvey,* 101 B.R. 250 (Bankr.D.Nev.1989), was a case in which no "badges or indicia of bad faith" were present, but where the court nonetheless dismissed on the ground that the individual debtors had failed to apply to the state court for the right to file an appeal bond "commensurate with their financial ability", as was apparently possible under applicable State law. *Id.* at 252. See also *In re Byrd,* 172 B.R. 970 (Bankr. W.D.Wash.1994), involving a Federal judgment, where the court said, "Unless the debtor can demonstrate that he has no alternative to stay the Committee's judgment other than by Chapter 11, his petition must be dismissed." 172 B.R. at 972.

5. *Expenses of the Appeal*

*In re Boynton, supra,* 184 B.R. at 583, involved a tax liability and individual debtors not engaged in business whose principal asset was a large investment portfolio. The court did not expressly find that the debtors could have bonded the tax assessment, but it was influenced by the fact that the debtors did have an investment portfolio of over $5 million, that there were no jobs at stake, that the dispute was essentially between the debtors and the taxing authorities, and that if permitted to remain

5. *Alton Telegraph* was followed in two cases involving individual chapter 11 debtors, *In re McLaury,* 25 B.R. 30 (Bankr.N.D.Tex.1982), where the Chapter 11 debtors were individuals with one large judgment creditor, largely on the grounds that the debtors had not taken any action to transfer or hide assets and had otherwise proceeded in accordance with proper bankruptcy procedures; and *In re Corey,* 46 B.R. 31 (Bankr.D.Hawai'i 1984), in which the individual Chapter 11 debtor again had one large judgment creditor. The court sustained the filing on the ground that the debtor "sought protection to avoid a forced sale so that she may prosecute her appeal of the State Court judgment. She is planning an orderly liquidation of her assets to pay all of her creditors [and] has also expressed a willingness to expedite her appeal of the judgment." *Id.* at 33. *See also In re McNichols,* 258 B.R. 892 (Bankr.N.D.Ill.2001), which concerned a creditor's motion for sanctions against the debtor for a frivolous Chapter 13 filing in lieu of posting a supersedeas bond. The Court found that the debtor had timely made her filings and had attempted unsuccessfully to obtain confirmation of a Chapter 13 plan and that the creditor had not met its burden of showing that the case had initially been filed in bad faith.

in bankruptcy, the debtors would be able to pay all of the costs of the appeal and of the Chapter 11 proceedings as administrative expenses having priority over the tax claims, thereby forcing the Internal Revenue Service to fund "the appeal against itself while it is prevented from seizing those funds and while the debtor avoids the requirement of an appeal bond." 184 B.R. at 583–84. It dismissed the case, notwithstanding that the debtors had already filed and obtained approval of a disclosure statement and had solicited votes for their plan.

6. *Attempt to Relitigate.*

Some of the cases have refused to permit debtors who have filed to "relitigate" a State judgment. The opinion in *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849 (Bankr.S.D.N.Y.1984), does not disclose many facts about the debtor's financial condition, but it did find that the debtor was "unable to propose a meaningful plan or reorganization until the litigation with [the State court plaintiffs] is resolved." It concluded, "It is evident that the debtor seeks to use this court not to reorganize, but to relitigate. This is an impermissible use of Chapter 11 of the Bankruptcy Code. Consequently, the above captioned petition must be dismissed." 36 B.R. at 851. *See also, In re Karum Group, Inc.*, 66 B.R. 436 (Bankr. W.D.Wash.1986).

*Application of Factors*

In applying the above factors to the case at bar, the filing here bears none of the "core" indicia of "bad faith." The Debtor did not transfer assets or take any other action to hinder or delay creditors prior to the filing of the case. With respect to the first and, to many courts, key factor listed above, the Shareholder Group does not argue that the Debtor has the means to pay the judgment or obtain an appeal bond. In their words, "*the Debtor is insolvent*" (emphasis in original). At least as a preliminary matter, the Bankruptcy Court is where insolvent entities end up, and an individual should not be shut out of Chapter 11 merely for being insolvent.

Another key factor listed above that courts have considered on the issue of "good faith" is whether the debtor is engaged in business or has employees and whether the judgment would force a "business" to close and liquidate. The Debtor here is engaged in a "business," but he has no employees, and he has not contended that he could not continue to be personally engaged in the consulting business in the future if this case were dismissed and his creditors were able to seize all of his assets and sell them outside of bankruptcy. But if this case were dismissed, he would be foreclosed from the opportunity afforded to all other Chapter 11 debtors to develop a plan that pays creditors what they are due over time in an orderly fashion and effect a financial rehabilitation. Both *Cohoes* and *C–TC 9th Avenue Partnership* hold that the good faith of a filing is to be determined on the basis of the petitioner's individual intent to reorganize and the lack of an intent to use bankruptcy solely as a mechanism to delay the creditor. A blanket rule that would require dismissal of a Chapter 11 case filed by an individual who did not have a business with employees but sought to prosecute an appeal without filing a bond would ignore the holding of these cases that the individual facts of the matter must be scrutinized. Such a rule would also undercut *Toibb v. Radloff*, 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991), in which the Supreme Court held that an individual could file under Chapter 11 and did not suggest that there should be any blanket restrictions to circumscribe an individual Chapter 11 case. Nor is there any apparent basis for finding that

an individual without employees is less worthy of Chapter 11 protection than Texaco, especially as a $3 million judgment can be as disastrous to an individual as the $11.2 billion judgment was to Texaco.

One of the factors considered on a motion to dismiss for bad faith is whether the case is a two-party contest between the debtor and the judgment creditor, and the fact that there are few creditors makes it appropriate to examine whether there is in fact a need for a Chapter 11 case, whether the debtor is attempting to stall one creditor and whether the State court is "a preferable forum." *In re C–TC 9th Avenue Partnership, supra,* 113 F.3d at 1312. Here, there are few other creditors, but there has been no attempt on the part of the debtor to relitigate or forum shop, nor will the Bankruptcy Court have to decide matters better litigated elsewhere. Moreover, this is not a mere two-party contest, as EBCI's rights would be impacted if the Shareholder Group were allowed to foreclose on the Debtor's property interests pledged to it, and EBCI has stated its preference that the case not be dismissed on the instant motion. This Debtor's interests are sufficiently complex and sophisticated to justify giving him the opportunity to utilize the flexible procedure of Chapter 11 to attempt to restructure his debt, satisfy his creditors, and retain a residual interest if he is so entitled.

■ The members of the Shareholder Group further argue that they so dominate and control BGI and Rosebud that the Debtor will not be able to propose any plan that they oppose. They allege that the "Debtor totally lacks any control over or input in management of his assets that a debtor must have to maintain a Reorganization case under chapter 11 of the Bankruptcy Code"—indeed, that they "totally control the Debtor's financial destiny." It may be that the Debtor will ultimately be unable to confirm a plan, in which case the proceeding would be subject to dismissal under § 1112(b)(1) or (2) of the Bankruptcy Code for "absence of a reasonable likelihood of rehabilitation" or "inability to effectuate a plan." However, where the debtor evidences an intent to reorganize at the outset of the case, these are not matters to be determined on a motion to dismiss for a "bad faith" filing, which looks to the status of the matter on the filing date. *See In re Cohoes, supra,* 931 F.2d at 227; *In re C–TC 9th Avenue Partnership, supra,* 113 F.3d at 1309–1310. Moreover, especially where the debtor is an individual, a creditor's claim that it wholly controls the debtor's "financial destiny" may weigh in favor of giving the individual access to a court of equity rather than against it.

The decisions above have also considered on a motion to dismiss for bad faith whether the debtor is attempting to "relitigate" the adverse judgment. An attempt to relitigate in Bankruptcy Court an issue that has been before another court has been held to be an indication of bad faith. *See, In re C–TC 9th Avenue Partnership, supra,* 113 F.3d at 1310; *but see In re Cohoes, supra,* 931 F.2d at 228. But there is no question here of "relitigation" as the suit in Montana proceeded to final judgment and the Bankruptcy Court is clearly bound by the judgment of the State court.[6]

6. In *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), the Supreme Court held that collateral estoppel principles apply to prevent relitigation in nondischargeability proceedings of issues that were actually decided in litigation in another court. In *Kelleran v. Andrijevic,* 825 F.2d 692 (2d Cir. 1987), *cert. denied,* 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988), the Second Circuit, citing 28 U.S.C. § 1738 and *Allen v. McCurry,* 449 U.S. 90, 96, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980), held that the bankruptcy

Taking the judgment as a fact, as we must, this Debtor was, on the filing date, and remains, in serious need of financial rehabilitation. *In re Cohoes, supra,* 931 F.2d at 228. A debtor's desire to appeal an adverse judgment cannot be equated with intent to relitigate.[7]

Two other important factors in bad faith dismissals are whether the debtor can post a bond and whether the costs of appeal are accruing as priority claims. These issues are likely to be highly significant in the administration of a Chapter 11 case, as they involve the conditions under which an appeal may proceed and the effect of the pendency of the appeal on the administration of the bankruptcy case. In some cases the debtor's financial condition may be deteriorating so quickly that creditors cannot fairly be stayed from executing on their judgment, or the debtor may be required to provide them with adequate protection as a condition to pursuit of the appeal. But these issues are more appropriately considered in connection with a motion for relief from the automatic stay, or on a motion to limit the debtor's discretion in effecting the appeal, not on a motion to dismiss.[8] Whether or not a debtor must affirmatively seek leave from the Bankruptcy Court in every case in which it seeks to pursue an appeal,[9] the judgment creditor could unquestionably move for relief from the stay or to condition the debtor's appeal rights in a case such as the one at bar, based on the delay caused by the appeal, the cost of the appeal, the likelihood of a reversal, judicial economy, and the balance of the harms. *See generally,*

court was required to give preclusive effect to a default judgment entered in State Court, holding flatly that "Bankruptcy proceedings may not be used to re-litigate issues already resolved in a court of competent jurisdiction." *Id.* at 695, 101 S.Ct. 411. Whether the result is based on collateral estoppel or *res judicata* or the *Rooker–Feldman* doctrine, the appellate courts have been very clear that bankruptcy courts cannot reconsider the results of State court litigation where the State court would not vacate the judgment (as for fraud, lack of jurisdiction). *See In re James,* 940 F.2d 46, 53 (3d Cir.1991) (relying on collateral estoppel); *In re Maurice,* 21 F.3d 767, 774 (7th Cir.1994) (*res judicata* prevented collateral attack on a State judgment advanced as a claim in a bankruptcy proceeding); *In re Goetzman,* 91 F.3d 1173, 1177–78 (8th Cir.1996), *cert. denied,* 519 U.S. 1042, 117 S.Ct. 612, 136 L.Ed.2d 537 (1996) (relying on the *Rooker–Feldman* doctrine, *see District of Columbia Court of Appeals v. Feldman,* 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983)).

7. The Debtor should not be faulted for filing after the adverse State court judgment had been entered, as an earlier filing would undoubtedly have been premature. *See In re SGL Carbon Corp.,* 200 F.3d 154 (3d Cir. 1999), where the court found that the debtor had filed prematurely and in bad faith because the lawsuits it feared had not yet resulted in a judgment and had not yet caused it substantial economic harm or the need to reorganize.

8. A debtor's ability to appeal without filing an appeal or supersedeas bond does not derive from any action of the bankruptcy court in relieving the debtor of a bonding "requirement." It derives from the fact that there is no requirement of a bond in order to appeal; the filing of the appeal or supersedeas bond relieves the judgment debtor from the plaintiff's efforts to execute on and collect the judgment. The automatic stay of the Bankruptcy Code in effect substitutes for the appeal bond and constitutes an independent bar to the enforcement of the judgment. A motion for relief from the stay by the judgment creditors would be the appropriate occasion to consider, in accordance with well-known rules, whether the appeal should be subject to conditions. These issues thus would not be confused with the distinct issue of "good faith."

9. There is authority that where the litigation was originally brought against the debtor, even the debtor must obtain relief from the automatic stay in order to appeal a judgment against it. *Association of St. Croix Condominium Owners v. St. Croix Hotel Corp.,* 682 F.2d 446 (3d Cir.1982).

*In re Sonnax Industries, Inc.*, 907 F.2d 1280, 1286 (2d Cir.1990).

In granting an individual debtor relief from the stay to prosecute an appeal, or on a creditor's motion for relief from the stay, the court could also condition continuation of the automatic stay during the course of the appeal on the payment of some of the costs out of the debtor's earnings from personal services performed after the petition date, which do not constitute property of the estate, Bankruptcy Code § 541(a)(6), or on the debtor's making a motion to expedite the appeal in accordance with the procedures of the non-bankruptcy court. *See In re Holm*, 75 B.R. 86 (Bankr.N.D.Cal.1987) (individual Chapter 11 debtor who had the financial ability would be required to file a bond as a condition to the right to remain in Chapter 11 and to pursue the appeal); *In re Corey, supra*, 46 B.R. at 33–34 (debtor agreed to expedite the appeal).[10]

In any event, the Debtor here received blanket authority to pursue the appeal, and the Shareholder Group did not seek to impose any limitations of a temporal or fiscal nature on the order granting the Debtor relief from the automatic stay to pursue the appeal. It complains that the costs of the appeal are accruing as administrative expenses, but it does not demonstrate that the costs of the appeal exceed what could have been anticipated at the time the Debtor received authority to pursue it. Moreover, much of the expenditure has been the result of litigation regarding the Shareholder Group's withholding of funds and violation of the automatic stay. See Decision Granting in Part and Denying in Part the Debtor's Motion for Summary Judgment (Bankr.S.D.N.Y. February 28, 2000, Bohanon, J.), *aff'd*, 2000 WL 558644 (S.D.N.Y.2000), *aff'd*, 2001 WL 138330 (2d Cir.2001). The Shareholder Group has not shown that the accrual of expenses is a sufficient ground on which to dismiss the case.[11]

In sum, taking the foregoing factors into account, and in light of the failure of the Shareholder Group to show that the Debtor lacked a good faith intent to reorganize his debt when he filed this case, or that he intended to use this court solely as a means to delay or frustrate them or relitigate State court issues, the motion to dismiss on bad faith grounds will be denied.

*The Debtor's Exclusivity Period*

Under § 1121 of the Bankruptcy Code, a Chapter 11 debtor has the exclusive right to file a plan during the first 120 days of the case, a period that the Bankruptcy Court can extend or reduce for "cause." This Debtor's "exclusive period" has been extended four times. The Court's last order, entered before the Montana Supreme Court decided the appeal, extended the period for four months but gave the Shareholder Group leave to seek to reduce the period for "cause." 11 U.S.C. § 1121(d).

The members of the Shareholder Group support their motion to terminate exclusivity with many of the same arguments made in support of the motion to dismiss. They claim that the Debtor is holding them hostage to the formulation of a plan that he cannot confirm over their objection, that their control over BGI and Rosebud makes the Debtor only a passive player, and that they should not be hampered in proposing a plan to pay the few other

10. It would seem that these conditions should be imposed sparingly so as not to burden a litigant's appeal rights unnecessarily. *Cf. Lindsey v. Normet*, 405 U.S. 56, 74–79, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972).

11. The Group has also objected to the Debtor's latest fee application, which is an appropriate forum to consider whether the Debtors' legal expenses are unreasonably high.

creditors in full and then pay over the Debtor's remaining assets—his minority stake in the entities they control—to them. The Debtor, prior to the decision of the Montana Supreme Court, argued that the pendency of the appeal constituted "cause" for effectively freezing the status of the bankruptcy case until the Montana appellate decision, protecting the Debtor's right to have the first opportunity to file a plan. The Debtor also contends that his minority interests in BGI and Rosebud are worth more than the Shareholder Group admits, especially if they are marketed fairly and without improper interference on the part of the Group.

The decisions on point have not been sympathetic to the proposition that there should be an extension of the exclusivity period merely because of the pendency of an appeal from an adverse judgment. *In re McLaury, supra,* 25 B.R. at 32, declined to dismiss an individual debtor's Chapter 11 case on bad faith grounds but refused to give the same debtor an extension of the exclusivity period. In *In re American Federation of TV. & Radio Artists,* 30 B.R. 772, 774 (Bankr.S.D.N.Y.1983), the same judge who summarily dismissed the *Wally Findlay Galleries* case on bad faith grounds found that the pendency of an appeal does not constitute cause for the extension of exclusivity. These cases are consistent with others that have held that the existence of litigation in various forms is to be expected in connection with a Chapter 11 case and does not, standing alone, justify extension of the exclusivity period. *Matter of Lake in the Woods,* 10 B.R. 338 (E.D.Mich.1981); *In re Southwest Oil Co. of Jourdanton,* 84 B.R. 448, 452 (Bankr.W.D.Tex.1987); *Matter of All Seasons Industries, Inc.,* 121 B.R. 1002 (Bankr.N.D.Ind.1990); *In re Scott,* 37 B.R. 184 (Bankr.W.D.Ky.1984); *In re Parker Street Florist & Garden Center,* 31 B.R. 206 (Bankr.D.Mass.1983) (the debtor can propose a plan taking into account the possible results of the litigation).

On the other hand, litigation may be one factor, among others, that supports an extension. In *In re Gibson & Cushman Dredging Corp.,* 101 B.R. 405 (E.D.N.Y.1989), the District Court affirmed the Bankruptcy Court's exercise of discretion in extending exclusivity where progress had been made and where the debtor's financial condition was improving. In *In re United Press International, Inc.,* 60 B.R. 265, 269–270 (Bankr.D.Dist.Col. 1986), the court extended exclusivity after finding that the debtor had overcome numerous obstacles and made great progress in a complicated case. *In re Texaco, Inc.,* involved the Bankruptcy Court's careful weighing of factors relating to exclusivity. The court granted Texaco's first request for an extension based on the size of the case and the complexity of the debtor's operations, as well as on the need to give the debtors "a reasonable opportunity to pursue their appeal of the Pennzoil judgment" and "to negotiate with the creditors in order to formulate a plan of reorganization." *In re Texaco, Inc.,* 76 B.R. 322, 325 (Bankr.S.D.N.Y.1987). Significantly, however, after Texaco had been substantially unsuccessful in the State court appellate process, the Bankruptcy Court extended exclusivity a second time but stated that it would terminate exclusivity if the Creditors Committee and the judgment creditor, Pennzoil, agreed on a joint plan and Texaco had the opportunity for input, thus encouraging Texaco to enter into the compromise with Pennzoil that became the foundation for a consensual plan. *See, In re Texaco, Inc.,* 81 B.R. 806, 807–809 (Bankr.S.D.N.Y.1988), for a detailed description of the above history as well as the court's refusal to terminate exclusivity altogether on a motion filed by shareholders; as to the history of the case generally,

*Kirk v. Texaco, Inc.,* 82 B.R. 678 (S.D.N.Y. 1988); as to confirmation, 84 B.R. 893 (Bankr.S.D.N.Y.1988).

In the instant case, the fact that the Debtor received blanket authority to pursue his appeal, the fact that the Shareholder Group has not argued that the Debtor's interests in BGI and Rosebud are deteriorating over the passage of time, the fact that the Debtor plans to file a plan in the immediate future, and the fact that there has been intransigence and continual litigation coming from the camp of the Shareholder Group all argue in favor of extending the exclusivity period. *See Matter of Homestead Partners, Ltd.,* 197 B.R. 706, 720 (Bankr.N.D.Ga.1996). The recent decision of the Montana Supreme Court makes it unnecessary to contemplate any further extensions of exclusivity that are not of a *de minimis* nature. Since the Shareholder Group has not shown sufficient cause why the period should be shortened, the Court will not exercise its discretion to terminate the Debtor's exclusivity period.

*Motion for an Examiner with Expanded Powers or a Trustee*

The Shareholder Group has moved in the alternative for the appointment of an examiner "with expanded powers," which is tantamount to the appointment of a trustee. The Bankruptcy Code authorizes the appointment of a trustee:

> (1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case... or
>
> (2) if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate... 11 U.S.C. § 1104(a).

Alternatively, an examiner may be appointed to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor, if—

> (1) such appointment is in the interests of creditors, any equity security holders, and other interests of the estate; or
>
> (2) the debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000. 11 U.S.C. § 1104(c).

The Shareholder Group does not allege that the Debtor's fixed, liquidated, unsecured debts of the type identified in § 1104(c)(2) exceed $5 million, and therefore it must show that an examiner or a trustee is required "in the interests of creditors, any equity security holders, and other interests of the estate," §§ 1104(a)(2) and (c)(1), or for "cause," which includes "incompetence or gross mismanagement of the affairs of the debtor." § 1104(a)(1). In its perfunctory attempt to satisfy this burden, it cites only the fact that the Montana court has found that the Debtor "intentionally decided the derail the financing, since the other parties would not do the refinancing on his terms." It also speculates that "should an offer arise to purchase one or more of CELP or YELP, there is a very high likelihood that the Debtor will once again scuttle Applicants' efforts in arranging for refinancing...."

There is no basis to speculate that in the event a refinancing of the YELP or CELP projects should be proposed, the Debtor would take action similar to that which has already caused him to suffer a $3 million judgment and become a Chapter 11 debtor. The Debtor's past act, for which he is paying dearly, does not

constitute the type of "incompetence or gross mismanagement" which is required in order to justify the appointment of a trustee. *Committee of Dalkon Shield Claimants v. A.H. Robins Co., Inc.*, 828 F.2d 239 (4th Cir.1987); *compare, In re Sharon Steel Corp.*, 871 F.2d 1217 (3d Cir.1989). "Some degree of mismanagement exists in virtually every insolvency case...mere mismanagement does not, by itself constitute cause. The philosophy of chapter 11 is to give the debtor a 'second chance' at business success." 7 Collier *Bankruptcy* ¶ 1104.02[3][c][i] (15th L.King. ed.). Moreover, on a motion for the appointment of a trustee, the focus is on the debtor's current activities, not past misconduct. *Id.* Speculation that a debtor may do something in the future does not overcome the strong presumption that the debtor should be permitted to remain in possession in a Chapter 11 case or justify the additional costs of a trustee. *In re Fairwood Corp.*, 2000 WL 264319, 43 Collier Bankr.Cas.2d 1345 (S.D.N.Y.2000), *aff'd*, 242 F.3d 364, 2001 WL 11045 (2d Cir.2001); *In re General Oil Distributors, Inc.*, 42 B.R. 402 (Bankr.E.D.N.Y.1984); *compare In re McCorhill Publishing, Inc.*, 73 B.R. 1013 (Bankr.S.D.N.Y.1987). Nor does the Shareholder Group point to "allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity" that an examiner is needed to investigate. 11.U.S.C. § 1104(c). The past act on which they rely has been the subject of a full trial and certainly requires no further investigation.

Sections 1104(a)(2) and (c)(1) of the Bankruptcy Code, using identical language, authorize the appointment of a trustee or examiner, respectively, if "such appointment is in the interests of creditors, any equity security holders, and other interests of the estate." Under these provisions, a creditor group, no matter how dominant, cannot justify the appointment of a trustee or examiner simply by alleging that it would be in its interests. It must show that the appointment is in the interests of all those with a stake in the estate, which in this case would include the Debtor. As Collier points out, "Use of the word 'and' suggests that creditors cannot on their own obtain the appointment of a trustee under the provision in order to disenfranchise equity security holders or other interests." 7 Collier, *Bankruptcy,* ¶ 1104.02[3][d][i] (15th L. King ed.). This is precisely the intent of the motion, by the Shareholder Group's own admission.

Since their motion was filed, the members of the Shareholder Group have been appointed as a creditors committee in this case and have also served discovery orders on the Debtor. These procedures under the Bankruptcy Code are available to creditors in appropriate Chapter 11 cases and ordinarily make it particularly inappropriate to impose on the estate, and probably on these same creditors, the sizable cost of a trustee or examiner. In this case, without determining any issues that are not now before the Court, it would appear that the committee can appropriately perform any necessary investigation.

Based on the foregoing, the Shareholder Group's motion for dismissal of the case on the grounds of the Debtor's alleged bad faith, for termination of the Debtor's exclusivity period, and for appointment of an examiner with expanded powers or a trustee is denied.

It is SO ORDERED.