**In re Bruce P. PAOLINI, Debtor.**

No. 03–77479–S.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

June 1, 2004.

John W. Hart, Virginia Beach, VA, for Debtor.

*MEMORANDUM OPINION*

STEPHEN C. ST. JOHN, Bankruptcy Judge.

The Motion to Dismiss filed herein by Albertsons, Inc. came on for hearing on March 30, 2004, and the parties made their final arguments on the Motion to Dismiss on April 19, 2004. At the conclusion of the hearing and arguments, the Court took the Motion to Dismiss under advisement. This constitutes the findings of fact and conclusions of law of this Court with respect to the Motion to Dismiss of Albertsons, Inc.[1]

I.

Findings of Fact

Bruce R. Paolini ("Paolini") commenced this case upon the filing of a voluntary petition under Chapter 11 of Title 11 of the United States Code in this Court on October 27, 2003.[2] On December 5, 2003, Albertsons, Inc. ("Albertsons") filed a Motion to Dismiss this case pursuant to 11 U.S.C. § 1112(b) ("Motion to Dismiss"). The Motion to Dismiss alleges Paolini filed suit against Albertsons ("Complaint") in the United States District Court for the District of Idaho ("District Court"). The Complaint alleges, among other causes, retaliation, wrongful discharge, breach of a covenant of good faith and fair dealing, fraud, and breach of contract. Mot. to

---

1. Also pending before this Court in this case are (1) an objection to exemptions filed by Albertsons, Inc. and (2) an application to employ special counsel filed by Bruce Paolini. The Court, with the consent of the parties, heard evidence with respect to the motion and objection at the same time as it heard evidence on the motion to dismiss. The Court continued the objection and the application generally pending its resolution of the motion to dismiss of Albertsons, Inc.

2. Paolini originally filed a petition under Chapter 11 of the Bankruptcy Code in this Court on October 1, 2003, designated as case number 03–76313–SCS. This first case was dismissed by an order of this Court entered on October 21, 2003 for failure of Paolini to timely file his lists, schedules and statement of affairs.

Dismiss, ¶ 1. ("Idaho Litigation") This Idaho Litigation arose as a result of Paolini's departure from the employment of Albertsons, where he had served as a Senior Vice President in the Labor Relations and Employment Law Department. *Id.* Albertsons answered the Complaint and filed a counterclaim which alleged Paolini was indebted to Albertsons under the terms of a promissory note. *Id.*

■ In the course of the Idaho Litigation, both Paolini and Albertsons respectively filed motions for summary judgment. Mot. to Dismiss, ¶ 2. On May 15, 2003, the District Court issued a Memorandum Decision and Order with respect to the summary judgment motions, and, in response to a Motion for Clarification filed by Albertsons, the District Court vacated its Memorandum Decision and Order. On August 7, 2003, the District Court issued an Amended Memorandum Decision. Mot. to Dismiss, ¶ 4. The Amended Memorandum Decision awarded summary judgment in favor of Albertsons on its counterclaim and on all the claims asserted against Albertsons by Paolini. *Id.* Paolini subsequently requested the District Court to stay Albertsons from enforcement of its judgment under the counterclaim pending appeal without bond, which stay was denied. Mot. to Dismiss, ¶ 5.[3] Paolini appeal-

---

**3.** The order of the District Court denying the stay of the judgment obtained by Albertsons without bond made the following findings:

In spite of the general requirement that a judgment debtor post a *supersedeas* bond in the full amount of the judgment, the district court, in its discretion, may use equitable principles to grant a stay of enforcement of the judgment pending appeal without a *supersedeas* bond. Equitable factors the Court may consider include: (1) the likelihood of success on the merits; (2) the extent of irreparable injury if a stay dos not issue; (3) the balance of hardships; and (4) the public interest. *United States v. Peninsula Communications, Inc.,* 287 F.3d 832 (9th Cir.2002).

The Court has reviewed the file, including the memoranda and affidavits submitted in support of, and in opposition to, the instant motion. Considering the arguments of counsel in light of the above principles, the Court determines that Paolini is not entitled to a stay.

With regard to the first factor, Paolini has failed to demonstrate a likelihood that he will prevail on appeal. Instead, he offers nothing more than a recitation of previous arguments which were rejected by this Court. The Court already has reconsidered its decision in this matter and stands by its decision. It is very unlikely that Paolini will succeed on appeal.

With regard to the second factor, both Paolini and Albertson's have provided the Court with affidavits intended to establish Paolini's financial situation. Absent a full evidentiary hearing on the state of Paolini's finances, it is impossible for the Court to credit one affidavit more than the other. However even were the Court to accept Paolini's affidavit as an accurate representation of his financial circumstances, Paolini is not without resources. Rule 62(d) dictates that, in the ordinary case, execution on a judgment for money should not be stayed unless the party that prevailed in the district court is secured from loss. Here, Paolini has failed to propose any plan whatsoever to provide adequate alternative security that would preserve even his current ability to satisfy the judgment.

With regard to the third factor, Paolini argues that, because he is facing financial challenges and because Albertson's is a large, financially secure company, the Court should be less concerned with protecting Albertson's interest in collecting the judgment than with protecting Paolini from bankruptcy. However, even large companies have a right to collect money judgments won in litigation.

With regard to the fourth factor, Paolini contends that the public interest will be served if he avoids filing bankruptcy and does not avail himself of the resources of the bankruptcy court. The Court, however, finds that Paolini's utilization of the bankruptcy court would place a *de minimis* burden on the public interest. Further, the Court concludes that the public interest is best served by protecting the judgment creditor's interest in an ultimate recovery.

Based on the foregoing, the Court finds that Paolini is not entitled to a stay because

ed the decision of the District Court to the United States Court of Appeals for the Ninth Circuit, which stayed the appeal after Paolini filed his petition here. Mot. to Dismiss, ¶ 6.

In support of the Motion to Dismiss, Albertsons alleges Paolini does not operate a business and is a salaried employee of Dollar Tree Stores, Inc., where he earns a substantial income as the Vice President for Associate Relations. Mot. to Dismiss, ¶¶ 7, 8. Albertsons further alleges Paolini's bankruptcy schedules indicate, at the time of filing his petition, he had only one secured creditor, the holder of the mortgage on his personal residence, no unsecured priority creditors and four unsecured non-priority creditors. These unsecured creditors scheduled are Albertsons Employee Credit Union with a claim of $21.95, American Express with a claim of $114.00 [4] and two attorneys with claims totaling $11,500.00. Mot. to Dismiss, ¶ 9–11. Albertsons also alleges in support of its Motion to Dismiss that Paolini caused to be transferred to his wife, Camilla Paolini ("Mrs. Paolini") the proceeds of certain accounts that Paolini and Mrs. Paolini had previously held ownership of as joint tenants. Mot. To Dismiss, ¶¶ 14, 15. Albertsons finally alleges Paolini has claimed all

of his personal property as being owned with Mrs. Paolini as tenants by the entirety and therefore exempt from his bankruptcy estate and that Paolini's substantial monthly expenses exceed his declared net income. Mot. to Dismiss, ¶¶ 16, 18–19.

Paolini responds to the Motion to Dismiss by admitting the circumstances of the Idaho Litigation and its current status, but denying the transfers of the various accounts caused any prejudice to any creditor. Paolini affirmatively alleges in his response that his bankruptcy filing was provoked by the inability to negotiate a payment arrangement which lead to seizure of some of Paolini's Idaho bank accounts by Albertsons in an attempt to satisfy its judgment entered on the counterclaim and to prevent garnishment of his salary in Virginia by Albertsons. Paolini asserts his bankruptcy filing was done in good faith and that there is no evidence of an absence of an honest intention on his part to avail himself of the reorganization process.

Our inquiry into the appropriateness of the Motion to Dismiss begins with a review of the bankruptcy schedules filed by Paolini.[5] Paolini lists real property of a value of $640,000.00 and personal property of a value of $289,945.76.[6] The sole secured

---

he has failed to demonstrate likely success on appeal. Further, Paolini has failed to offer alternative security that would protect Albertson's interest in collecting its judgment. Albertson's, no less than any judgment creditor, is entitled to such security. Finally, the public interest is best served by protecting Albertson's right to collect on its judgment.
Albertsons Ex. 2.

4. Sometimes in his various pleadings and schedules Paolini refers to an unsecured claim in the amount of $114.00 held by "Cardmember Services." It appears this is the identical claim at times referred to as held by "American Express." For purposes of clarity, this claim will be identified as held by

"American Express" which appears to be the legal entity that actually owns this claim.

5. Paolini filed Amended schedules B, C, and I with the Court on December 1, 2003.

6. In addition to a variety of household furnishings and personal effects, Paolini in his amended schedules listed various bank and brokerage accounts totaling $14,563.22, an individual retirement account in the amount of $114,559.13, two deferred compensation accounts totaling $59,698.20, two insurance policies with a total cash value of $20.753.21, a salary claim of $5,500.00 due from his present employer, Dollar Tree Stores, Inc., and 1998 Mercedes and 2000 Jaquar automobiles.

indebtedness scheduled by Paolini is a mortgage on his personal residence owed to Wells Fargo Home Mortgage, Inc. in the amount of $394,497.00. There are no scheduled unsecured priority creditors. The only unsecured, non-priority creditors listed are the following:

| | |
|---|---|
| Albertsons Employee Credit Union/credit card— | $ 21.95 |
| American Express /credit card— | 114.00 |
| David Zobel, counsel for Albertsons— | 1.00 |
| Harry Telfeian/attorney's fees | 10,000.00 |
| Nanette Joslyn/attorney's fees | 1,500.00 |

The schedules also list a disputed claim of Albertsons in the amount of $1,192,552.75. Paolini additionally has scheduled gross monthly income of $16,447.50 and net monthly income, after deductions, of $11,774.00. Paolini lists monthly expenses of $12,564.07, leaving a monthly deficit of $790.07.[7] Paolini's Statement of Financial Affairs indicates Paolini received $398,569.00 in compensation from Albertsons in 2001, $295,291.95 in compensation from Dollar Tree Stores, Inc. In 2002 and $204,243.02 in compensation from Dollar Tree Stores, Inc. in 2003 through his filing date of October 27, 2003. Finally, the Statement of Financial Affairs discloses that on May 30, 2003 $53,634.52 was transferred from what was characterized by Paolini as a tenants by the entirety account owned by Paolini and his wife in Liberty Funds Services, Inc. to an account owned solely by Mrs. Paolini. Also disclosed was a transfer of $30,000.00 on June 6, 2003 from an account owned by Paolini and his wife and characterized as held as tenants by the entirety at A.G. Edwards to an account owned solely by Mrs. Paolini.

Paolini is an attorney licensed in the State of New Jersey since 1984. Tr. at 10. Paolini received a bachelor's degree and a law degree from Wake Forest University. *Id.* He also received a masters degree in business administration from Rutgers University. *Id.* Paolini commenced employment with Albertsons in 1984. Tr. at 11. In 1992 Paolini was promoted to Vice President of Labor Relations. *Id.* In 1998 Paolini was promoted to Senior Vice President of Labor Relations and Employment Law. *Id.* In this position he was responsible for all labor relations and employment law for Albertsons. *Id.* Albertsons employed 235,000 employees and Paolini supervised approximately twenty (20) attorneys in this position. *Id.*

In August 2001, Paolini ceased to be employed by Albertsons. Tr. at 12. The circumstances of Paolini's cessation of employment are hotly disputed by Paolini and Albertsons and ultimately resulted in the Idaho Litigation. Tr. at 12, 13. Both Albertsons and Paolini filed motions for summary judgment in the Idaho Litigation. Tr. at 12, 13. The District Court entered summary judgment against Paolini on his claims against Albertsons and in favor of Albertsons on its claim against Paolini, which resulted in the entry of a judgment against Paolini for an amount in excess of $411,000.00, plus interest, fees and costs. Tr. at 15, 16; Albertsons Ex. 1. Paolini noted an appeal of the decision of the District Court in the Idaho Litigation to the United States Court of Appeals for the Ninth Circuit. Tr. at 16. Paolini was unable to post a suspending bond on appeal. Tr. at 17. Paolini filed a motion with the District Court seeking a stay pending appeal without bond, which motion was denied. *Id.;* Albertsons Ex. 2.

Subsequent to his cessation of employment with Albertsons, Paolini was unem-

---

**7.** Among the monthly expenses scheduled by Paolini are a mortgage payment of $3,330.28, cellular phones of $230.00, $1,600.00 for food, $600.00 for clothing, $300.00 for laundry and dry cleaning, $650.00 for transportation, $739.50 for recreation, clubs and entertainment, $30.00 for Bally Total Fitness, $1,256.00 for private school tuition, $200.00 for a housekeeper, and $800.00 for Mrs. Paolini's credit cards.

ployed from August 2001 until December 2001, when Paolini became employed with Dollar Tree Stores, Inc. Tr. at 9. Paolini currently is Vice President of Associate Relations.[8] *Id.* Paolini has a base salary of $185,000.00 annually. *Id.* In addition, Paolini receives an incentive bonus which is based upon performance of Dollar Tree Stores, Inc. and upon Paolini's individual performance. *Id.* Paolini's incentive bonus for calendar year 2002 (received in 2003) was $61,000.00. Tr. at 139. His incentive bonus for calendar year 2003 had not yet been determined at the time of the hearing on the Motion to Dismiss. *Id.* In addition, Paolini receives a $500.00 monthly automobile allowance and participates in various employee benefit plans, including a deferred compensation plan. Tr. at 81; Albertsons Ex. 23.

Paolini and Mrs. Paolini testified at length about their financial deterioration after cessation of his employment at Albertsons, with each lamenting about Paolini's substantively greater income at Albertsons and the resulting benefit of his income to their prior lifestyle in Boise, Idaho while employed there by Albertsons. Tr. at 71–74, 136–137.[9] Paolini detailed his inability under his current annual income of approximately $250,000.00 to continue education of his children in private school and to have his children participate in junior golf tournaments as he believes is necessary to develop their talents. Tr. at 107–110.

After the District Court had initially indicated it would grant the summary judgment motion of Albertsons in its Memorandum Decision and Order of May 15, 2003, Mrs. Paolini sought the advice of counsel on the implications of the District Court's ruling. Tr. at 157–158. Mrs. Paolini additionally sought the counsel of John Hart, Esquire ["Hart"] because she "had some financial commitments coming up in the near future so that [she] needed to transfer some money out of [Idaho]—or into Virginia" and she "wanted to make sure whatever transfers [she] made or whatever [she] did with the money was proper, in light of what could happen in the future, because [she] didn't know what could happen." Tr. at 158. Mrs. Paolini initially met with Hart on May 20, 2003 and had a second meeting with Hart shortly thereafter. Tr. at 159, 160. Paolini did not accompany Mrs. Paolini to either of Mrs. Paolini's meetings in May 2003 with Hart. *Id.* Mrs. Paolini discussed with Hart the kinds of assets she and Paolini owned as well as their liabilities. Tr. at 160, 161. Mrs. Paolini specifically advised Hart of the existence of two jointly-held accounts owned by she and Paolini at A.G. Edwards ["Edwards Account"] and Liberty Funds ["Liberty Account"]. Tr. at 164, 165. After her meeting with Hart, Mrs. Paolini believed she could transfer the monies in the Edwards Account and the Liberty Account into a new account solely in Mrs. Paolini's name. Tr. at 166. In order to provide an explanation to Paolini of the advice Mrs. Paolini had received from Hart, Hart offered to write a letter to Paolini and Mrs. Paolini. Tr. at 168. The letter, dated June 4, 2003, was received and read by Paolini. *Id.* Mrs. Paolini advised her husband of the transfers from the Edwards Account and the Liberty Account after the monies had been trans-

---

**8.** Paolini testified that Dollar Tree Stores, Inc. refers to all employees as "associates." Tr. at 9.

**9.** While both Mr. and Mrs. Paolini testified at length as to their perception of the substantial deterioration of their lifestyle since Paolini's termination of employment with Albertsons, it does not appear their lifestyle has changed since Paolini's filing of bankruptcy. *See infra.*

ferred. Tr. at 169. The monies were transferred by Mrs. Paolini into an account solely in her name at Wachovia Bank. The monies transferred totaled $83,634.52, consisting of $30,000.00 from the Edwards Account and $53,634.52 from the Liberty Account at the time of the transfer by Mrs. Paolini. Tr. at 171, 172.[10] The monies so deposited in the Wachovia Account appear to have been largely dissipated, with only about $2,600.00 remaining unspent. Tr. at 192. Most of the monies appear to have been spent to pay household expenses and significant amounts of attorney's fees incurred by Paolini and Mrs. Paolini. Tr. at 192.

After denial of the stay pending appeal without bond by the District Court, Albertsons commenced efforts to enforce its judgment obtained against Paolini by initiating a garnishment action in late September 2003 against a joint account of Paolini and Mrs. Paolini maintained at the Albertsons Federal Credit Union. Tr. at 17, 18. The garnishment was successful in recovering monies from Paolini's account at the Albertsons Federal Credit Union. Tr. at 18. Shortly thereafter, on October 1, 2003, Paolini filed his first Chapter 11 petition,[11] which was followed by the instant petition on October 27, 2003. Paolini's bankruptcy filing was solely provoked by the judgment of Albertsons in the Idaho Litigation. Paolini testified that "[i]f I did not have a judgment against me for in excess of $400,000...I probably would not need to

file bankruptcy at this time." Tr. at 69. No other creditors were applying pressure to Paolini at the time of his filing. *Id.* Indeed, Paolini believes "that after the Ninth Circuit rules, [he] will not need to be in bankruptcy;" and that if enough money is obtained from the Idaho Litigation, he will discontinue this bankruptcy. Tr. at 69, 70. Paolini also testified that he, while employed at Albertsons, made between $150,000.00 and $200,000.00 more than he currently is compensated at Dollar Tree Stores, Inc. and that he is actively seeking employment that is comparable to what he had at Albertsons. Tr. at 98.

In his bankruptcy schedules, Paolini listed extensive items of personal property; virtually all of the personal property so scheduled has been claimed as exempt as held by Paolini and Mrs. Paolini as tenants by the entirety. Paolini in his testimony admitted the omission of two whole life insurance policies he owns from his schedule of personal property filed with the Court. Tr. at 23.[12] Also omitted from his schedules were amounts for which Paolini was obligated to pay to the two private schools his children attend. Tr. at 136.[13]

Despite their general statements to the contrary, it does not appear the Paolini's have materially changed their lifestyle since Paolini filed for protection under Chapter 11 of the Bankruptcy Code. The Paolini's continue to remain members of

10. The Court received much evidence from Paolini and Mrs. Paolini as to the documentation and ownership of the Liberty Account and the Edwards Account prior to the transfer of these monies by Mrs. Paolini to the account solely in her name at Wachovia Bank. It appears to the Court that the Liberty Account and the Edwards Account were owned by Paolini and his wife as joint tenants with right of survivorship. See Ex. 4, 9, 10, 11.

11. See footnote 2, *supra.*

12. After the evidentiary hearing on the Motion to Dismiss, Paolini on April 16, 2004 amended his schedule B to include the two life insurance policies.

13. Paolini also amended his bankruptcy schedules on April 16, 2004 to reflect the installment contracts for the payment of tuition to the private schools attended by his children.

the Princess Anne Country Club[14] and their household expenses appear identical to their substantial expenses which they incurred in the several months immediately prior to Paolini's bankruptcy filing. Tr. at 70–73, Albertsons Ex. 40, 41, 42.[15]

Albertsons made substantial inquiry at the hearing on the Motion to Dismiss as to whether two of the scheduled unsecured claims were in fact owed at the time of his filing. Mr. Henry Telefeian was scheduled as an unsecured creditor in the amount of $10,000.00, Albertsons Ex. 3. Mr. Telfeian assisted Paolini with the Idaho Litigation. Tr. at 28. Paolini "spoke to Telfeian a lot on the telephone about [his] case" and Mr. Telfeian gave advice to Paolini. *Id.* Mr. Telfeian did not file any pleadings in the Idaho Litigation nor did he make any appearances on behalf of Paolini. *Id.* No formal engagement letter was sent by Mr. Telfeian to Paolini. *Id.* Paolini and Mr. Telfeian discussed Paolini paying him but Mr. Telfeian never sent a bill to Paolini until late December 2003. Tr. at 30. The bill amount was for $13,140.00. *Id.* When Paolini completed his bankruptcy schedules, Paolini spoke with Mr. Telfeian and was told the fees incurred were about $10,000.00. Tr. at 31. Later Paolini called Mr. Telfeian and asked for an invoice. *Id.* Paolini also scheduled an unsecured claim in the amount of $1,500.00 owed to Nanette Joslyn, Esquire. Tr. at 23, Albertsons Ex. 3. Ms. Joslyn is an attorney who assisted Paolini with his appeal of the Idaho Litigation to the United States Court of Appeals for the Ninth Circuit. Tr. at 23, 24. Ms. Joslyn was given a retainer of $1,000.00 in June 2003 paid from the Edwards Account. Tr. at 26. Ms. Joslyn

was paid an additional $1,500.00 by Paolini in August 2003. *Id.* It appears the amounts paid by Paolini to Ms. Joslyn exceed the amounts claimed by Paolini as owed to Ms. Joslyn prepetition. Tr. at 26, Albertsons Ex.3.

At the time of the hearing on the Motion to Dismiss Paolini had not filed a plan of reorganization. His testimony as to the anticipated contents of a plan of reorganization was somewhat non-committal as Paolini revealed little but that he and his counsel had discussed various options. Tr. at 101, 102. Subsequent to the evidentiary hearing on the Motion to Dismiss, Paolini filed a plan of reorganization ("Plan") and disclosure statement on April 15, 2004.[16] The Plan establishes three classes of creditors. Class 1 consists of Wells Fargo Home Mortgage, Inc., the holder of the deed of trust on Paolini's personal residence. Class 2 consists of creditors holding unsecured prepetition claims against Paolini which are undisputed. These creditors constituting this class are a claim of Albertsons Employee Federal Creditor Union in the amount of $21.95, American Express in the amount of $114.00, Henry Telfeian, Esquire with a claim of $10,000.00 and Nanette Joslyn, Esquire with a claim of $1,500.00. Class 3 under the Plan is composed of creditors holding disputed prepetition claims and consists solely of Albertsons' claim of $1,192,552.75. Plan, Art. III. The Plan concedes the claim of Wells Fargo Home Mortgage, Inc. is unimpaired and is proposed to be paid in accordance with its existing note and deed of trust. The treatment of the impaired classes 2 and 3 varies greatly. Class 2

---

**14.** Both Paolini and Mrs. Paolini testified their country club membership is solely for the benefit of their children. Tr. at 110, 196.

**15.** The lifestyle changes testified to by Paolini and Mrs. Paolini appear to have resulted from Paolini's reduced income while employed at

Dollar Tree Stores, Inc. rather than as a result of his bankruptcy filing. *See infra.*

**16.** Arguments on the Motion to Dismiss were heard on April 19, 2004.

creditors would be paid in full out of the income and assets of Paolini within twelve (12) months. Plan, Art. VI. After confirmation of the Plan, the claim of Albertsons would be paid in full if Paolini prevails in the Idaho Litigation from the proceeds of that cause of action. *Id.*[17] If Paolini does not prevail, Albertsons would be paid fifteen percent (15%) of its claim on a deferred basis without interest. *Id.* Paolini would liquidate his interest in his whole life insurance policies and sell his Rolex watch. *Id.* Paolini would allocate six percent (6%) of his normal take home salary for a period of three (3) years after confirmation and $3,600.00 of his 2003 bonus and fifteen percent (15%) of any bonuses received for three (3) years after confirmation. *Id.* Any additional monies necessary to pay fifteen percent (15%) of Albertsons' claim would be either withdrawn from Paolini's 401K account at Dollar Tree Stores, Inc. or obtained from the refinance of his personal residence. *Id.* Finally, upon confirmation of the Plan, Paolini would authorize Albertsons to offset the entire remaining portion of Paolini's deferred compensation plan with Albertsons to be applied toward their claim.[18]

## II

### Conclusions of Law *Carolin Corporation* and Bad Faith

In the decision of *Carolin Corp. v. Miller*, 886 F.2d 693 (4th Cir.1989), the Fourth Circuit Court of Appeals concluded "that a bankruptcy court may dismiss such a petition for want of good faith in its filing, but only with great caution and upon supportable findings both of the objective futility of any possible reorganization and the subjective bad faith of the petitioner in invoking this form of bankruptcy protection." *Id.* at 694. In so concluding, the Court found such a requirement "is implicit in several specific provisions of the bankruptcy code, interpreted in light of established policy considerations underlying the code's provision of bankruptcy protection." *Id.* at 698. The court looked specifically to the provisions of 11 U.S.C. § 1112(b) as support for such a requirement of good faith:[19]

---

17. Paolini in his disclosure statement estimates the value of his claim against Albertsons is in excess of Fifty Million Dollars ($50,000,000.00). Disclosure Statement at 29.

18. Previously this Court granted Albertsons relief from the automatic stay pursuant to 11 U.S.C. § 362 to permit Albertsons to offset monies payable monthly to Paolini as a distribution from Paolini's interest in a deferred compensation plan of Albertsons. The order of this Court granting relief permitted the offset as the payments become due and payable to Paolini each month.

19. 11 U.S.C. § 1112(b) provides as follows:

Except as provided in subsection (c) of this section, on request of a party in interest or the United States trustee or bankruptcy administrator, and after notice and a hearing, the court may convert a case under this chapter to a case under Chapter 7 of this title or may dismiss a case under this chapter, whichever

is in the best interest of creditors and the estate, for cause, including–
   (1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;
   (2) inability to effectuate a plan;
   (3) unreasonable delay by the debtor that is prejudicial to creditors;
   (4) failure to propose a plan under section 1121 of this title within any time fixed by the court;
   (5) denial of confirmation of every proposed plan and denial of a request made for additional time for filing another plan or a modification of a plan;
   (6) revocation of an order of confirmation under section 1144 of this title, and denial of confirmation of another plan or a modified plan under section 1129 of this title;
   (7) inability to effectuate substantial consummation of a confirmed plan;
   (8) material default by the debtor with respect to a confirmed plan;

For three distinct reasons, a generalized "good faith filing" requirement appears implicit in § 1112(b). First, the provision lists objective circumstances which presumably justify dismissal because they suggest the futility of reorganization proceedings. Second, and more significantly, the listed circumstances are generally consistent with and may in fact affirmatively evidence a subjective lack of good faith on the part of a Chapter 11 petitioner. Finally, of course, § 1112(b) permits dismissal not only in the enumerated circumstances but, more generally, "for cause," further suggesting the propriety of dismissal in the face of a petitioner's lack of good faith. As the pertinent legislative history puts it, "[t]he list is not exhaustive. The court will be able to consider other factors as they arise, and to use its equitable powers to reach an appropriate result in individual cases."

*Id.* at 699 (citing H.R.Rep. No. 595, 95th Cong., 2d Sess. 406, *reprinted* in 1978 U.S.C.C.A.N. 57871, 5963, 6362).[20]

■ The exercise of the remedy of dismissal for want of good faith, while authorized by the Bankruptcy Code and Rules, nonetheless is a "power, while essential to proper administration of Code policies and implicit in the statute itself, is obviously one to be exercised with great care and caution" as "[d]ecisions denying access at the very portals of bankruptcy, before an ongoing proceeding has even begun to develop the total shape of the debtor's situation, are inherently drastic and not lightly to be made." *Carolin Corp.*, 886 F.2d at 700. Accordingly, the Fourth Circuit concluded that "*both* objective futility and subjective bad faith be shown in order to warrant dismissals for want of good faith." *Id.* at 700–1. This duality of necessary finding was so emphasized:

> This means that if the only question raised is whether a reorganization is realistically possible, i.e., if there is no question of the petitioner's subjective good faith in filing, threshold dismissal of a petition is not warranted. In those circumstances the question of ultimate futility is better left to post-petition developments. By the same token, even if subjective bad faith in filing could properly be found, dismissal is not warranted if futility cannot also be found.

*Id.* at 701. "The objective futility inquiry is designed to insure that there is embodied in the petition 'some relation to the statutory objective of resuscitating a financially troubled [debtor].'" *Id.* at 701 (quoting *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir.1983)). The aim of the

---

    (9) termination of a plan by reason of the occurrence of a condition specified in the plan; or
    (10) nonpayment of any fees or charges required under Chapter 123 of title 28.

**20.** The Court also found authority to dismiss a case for good faith in the provisions of 11 U.S.C. § 362 concerning termination, annulment, modification or conditioning of the automatic stay and in Bankruptcy Rule of Procedure 9011, which requires all bankruptcy pleadings, including Chapter 11 petitions, must be filed in good faith. *Carolin Corp.*, 886 F.2d at 699–700. The Fourth Circuit Court of Appeals additionally has concluded it is also appropriate to consider the *Carolin*

*Corp.* analysis of subjective bad faith and objective futility in the context of a motion to reconvert a case to a proceeding under Chapter 7 of the Bankruptcy Code after the debtor had converted to a Chapter 11. In *Finney v. Smith*, 992 F.2d 43 (4th Cir.1993), the Fourth Circuit found the district court "correctly held the *Carolin* standard to apply whether the remedy sought is dismissal ... or reconversion to Chapter 7" *Id.* at 45. The case was remanded to the bankruptcy court for the conduct of an evidentiary hearing on the question of whether this individual debtor's Chapter 11 reorganization was objectively futile. *Id.* at 46.

subjective bad faith inquiry is "to determine whether the petitioner's real motivation is 'to abuse the reorganization process' and 'to cause hardship or to delay creditors by resort to the Chapter 11 device merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities.'" *Id.* at 702 (quoting *In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (9th Cir. BAP 1983)). In assessing whether these two criteria are met in a given case, a totality of the circumstances inquiry is required. *Id.* at 701.

■ When attacking a debtor's good faith in filing a petition, the creditor must establish a prima facie showing of the debtor's lack of good faith. *In re Davis,* 93 B.R. 501, 504 (Bankr.S.D.Tex.1987) (citing *In re Universal Clearing House Co.,* 60 B.R. 985, 994 (D.Utah 1986)). Once this prima facie showing is made, the debtor has the burden of proving that the petition was filed in good faith. *In re Universal Clearing House Co.,* 60 B.R. at 994 (citing *In re Century City, Inc.,* 8 B.R. 25, 30 (Bankr.D.N.J.1980)). It remains then to assess whether the evidence adduced at the hearing here warrants dismissal of this case.

### III.

### Subjective Bad Faith

■ Albertsons points to several principal factors here as supporting their assertion that Paolini's petition was filed in bad faith: (1) Paolini is using his petition to achieve a stay of the Idaho Litigation without posting a bond after denial of a stay pending appeal without bond by the District Court; (2) the bankruptcy case of Paolini is essentially a two-party dispute between Paolini and Albertsons; (3) the transfer of certain accounts by Mrs. Paolini from joint accounts to an account of Mrs. Paolini establishes Paolini's bad faith, and; (4) Paolini's lifestyle and expenditures betray his inappropriateness as a Chapter 11 debtor. While the clear command of *Carolin Corp.* is to assess the totality of the circumstances of a given case to determine whether a petition was filed in bad faith, a review of prior decisions where these same factors were assessed provides some guidance to this Court in its determination.

### Chapter 11 as Alternative to Posting Of An Appeal Bond

One of the principal complaints of Albertsons concerning the alleged lack of good faith of Paolini in filing his Chapter 11 petition here is that Paolini is utilizing this bankruptcy case as a means to stay Albertsons enforcement of its judgment obtained in the District Court. Albertsons asserts that Paolini's Chapter 11 filing was solely provoked by the declination of the District Court to issue a stay of the enforcement of the Albertsons judgment pending appeal without the posting of a bond. This, Albertsons believes, taints the bankruptcy filing here as being for an improper motive and subject to dismissal for bad faith.

A number of decisions have considered whether a bankruptcy filed for the purpose of obtaining a stay of litigation was proper. The answers offered by these courts have been mixed, motivated at least in part by considerations of whether the enforcement of the creditor's judgment would severely disrupt the debtor's business operations and whether the debtor has sufficient assets to post a bond to support the stay pending appeal or to satisfy the judgment. As one court has explained:

One primary characteristic of those cases not finding bad faith is that the judgment together with the debtors' other liabilities substantially exceeded the assets. Another characteristic included

the cooperativeness of the debtors in providing information to assist the court and creditors in expeditiously handling the cases. Those courts also found that the debtors had been forced into bankruptcy to avoid a forced sale and liquidation of its assets. *In re Fox*, 232 B.R. 229, 233–4 (Bankr. D.Kan.1999) (citing *In re Davis*, 93 B.R. 501, 503 (Bankr.S.D.Tex.1987)). *See, e.g., In re Corey*, 46 B.R. 31, 32 (Bankr.D.Haw. 1984); *In re McLaury*, 25 B.R. 30, 32 (Bankr.N.D.Tex.1982); *In re Alton Tel. Printing Co.*, 14 B.R. 238, 241 (Bankr. S.D.Ill.1981). Another court has summarized the decisions permitting a Chapter 11 filing in lieu of a *supersedeas* bond: "Generally two types of cases have allowed a Chapter 11 filing in lieu of a *supersedeas*

bond. These are: 1) where there is a multinational company faced with mass tort litigation; or 2) where a large debt would force the debtor to close its business and liquidate." *In re Boynton*, 184 B.R. 580, 583 (Bankr.S.D.Cal.1995) (citing *Mueller v. Sparklet Devices (In re Sparklet)*, 154 B.R. 544, 548 (Bankr.E.D.Mo. 1993)).[21]

In contrast, decisions where a bad faith dismissal was found justified generally have "dealt with smaller judgments where the debtor had the ability to satisfy the judgment without losing the ability to stay in business." *Id.* at 582 (citing *In re Holm*, 75 B.R. 86, 87 (Bankr.N.D.Cal. 1987)). *See, e.g., Marsch v. Marsch (In re Marsch)*, 36 F.3d 825, 829 (9th Cir.1994) ("[e]ven assuming a Chapter 11 petition

---

**21.** As observed by Judge Gropper, the Supreme Court *in dicta* has considered in a context other than a motion to dismiss the propriety of using a Chapter 11 filing for the purpose of staying enforcement of a judgment:

> *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), involved a $11.2 billion dollar judgment against Texaco, Inc. in the Texas State courts. In the words of one of the many opinions in the subsequent Chapter 11 case, the filing was "solely in order to gain the benefit of the automatic stay provisions of the Bankruptcy Code § 362, and to prevent Pennzoil [the judgment creditor] from perfecting judgment liens on its property, or collecting the judgment prior to appellate finality…" *Kirk v. Texaco*, 82 B.R. 678, 679–80 (S.D.N.Y.1988); *see also In re Texaco, Inc.*, 76 B.R. 322 (Bankr.S.D.N.Y.1987). The Texaco Chapter 11 filing followed not only the $11.2 billion jury verdict but also an injunction that was issued by the U.S. District Court for the Southern District of New York, [*Texaco, Inc. v. Pennzoil Co.*,] 626 F.Supp. 250 [(S.D.N.Y.1986)], modified by the Second Circuit, 784 F.2d 1133, preventing Pennzoil from executing on the judgment during the course of Texaco's appeal; the injunction was vacated by the Supreme Court. 481 U.S. 1, 107 S.Ct. 1519, 95

L.Ed.2d 1 [(1987)]. Three justices of the Supreme Court who concurred in the lifting of the injunction stated in *dicta* that Texaco could obtain the stay of enforcement it was seeking in bankruptcy court by virtue of § 362 of the Bankruptcy Code. Justices Brennan and Marshall said in their concurring opinion:
> Texaco clearly could exercise its right to appeal in order to protect its corporate interests even if it were forced to file for bankruptcy under Chapter 11. 11 U.S.C. § 362. Texaco, or its successor in interest, could go forward with the appeal, and if it did prevail on its appeal in Texas courts, the bankruptcy proceedings could be terminated. § 1112. Texaco simply fails to show how the initiation of corporate reorganization activities would prevent it from obtaining meaningful appellate review." 481 U.S. at 22, 107 S.Ct. 1519. Justice Stevens expressed a similar view. 481 U.S. at 32, [, 107 S.Ct. 1519] n., 107 S.Ct. 1519. Justice Blackmun, who also concurred separately, thought that the notion that Texaco could enter Chapter 11, pursue its appeal and then reemerge was "somewhat at odds with the corporate reorganizations that might occur in bankruptcy," but he did not suggest there was a good faith issue. *Id.* at 28, 107 S.Ct. [1]519.

*In re Sletteland*, 260 B.R. 657, 662–3, 663 n. 3 (Bankr.S.D.N.Y.2001).

may be used [to avoid posting of an appeal bond] when enforcement of a judgment would cause severe business disruption, a question we leave open, this would not help the debtor here. The bankruptcy court found that the debtor had the financial means to pay the judgment. Moreover, because she wasn't involved in a business venture, the judgment didn't pose any danger of disrupting business interests"); *In re Karum Group, Inc.*, 66 B.R. 436, 438 (Bankr.W.D.Wash.1986); *In re Smith*, 58 B.R. 448, 451 (Bankr.W.D.Ky.1986); *In re Wally Findlay Galleries, Inc.*, 36 B.R. 849, 851 (Bankr.S.D.N.Y.1984); *In re Davis*, 93 B.R. 501, 503–04 (Bankr.S.D.Tex. 1987)(along with other factors such as undervaluation of assets and claim in his schedules and a lack of cooperation in the bankruptcy proceeding, a prima facie showing of a lack of good faith was established by "the Debtor's admission to having no other alternative but bankruptcy to avoid posting a *supersedeas* bond; the two-party nature of the dispute, including the absence from the schedules of unsecured creditors unrelated to the state court suit [and] the Debtor's apparent ability to meet all his economic expenses"); *In re Boynton*, 184 B.R. 580, 583–4 (Bankr. S.D.Cal.1995). In at least one dismissal, the inability of the debtor to post a bond was found nonetheless not influential to the court as the debtor was not insolvent but for the judgment entered against it and the debtor was unable to propose a meaningful plan of reorganization until the litigation was complete, which illustrated the bankruptcy filing was not for rehabilitative purposes. *In re Karum Group, Inc.*, 66 B.R. at 438. Finally, some courts appear to suggest that the use of bankruptcy as a replacement for a *supersedeas* bond offends the notions of federalism and deference to state law. *See, e.g., In re Smith*, 58 B.R. at 451 ("[d]ue regard for principles of federalism requires no less than our unrelenting respect for the controlling state law on *supersedeas* bonds.").

## Two Party Dispute

Closely related to appeal bond cases are decisions which have considered whether a bankruptcy case is in essence a two party dispute in the context of a motion to dismiss for bad faith. In these decisions bankruptcy filings under Chapter 11 were dismissed primarily because the filing was motivated by a two party dispute between the debtor and a creditor. *In re Crown Financial, Ltd.*, 183 B.R. 719, 722–3 (Bankr.M.D.N.C.1995) ("[w]here a debtor's reorganization effort involves essentially a two-party dispute which can be resolved in state court, and the filing for relief under Chapter 11 is intended to frustrate or delay the legitimate efforts of creditors to enforce their rights against the debtor, dismissal for cause is warranted"); *In re Harvey Probber, Inc.*, 44 B.R. 647, 650 (Bankr.D.Mass.1984) ("[Chapter 11] clearly was not intended as an alternate forum for private disputes that only involved the disputants for which there was a well established albeit less expeditious forum"); *In re Van Owen Car Wash, Inc.*, 82 B.R. 671, 673 (Bankr.C.D.Cal.1988) ("two-party civil lawsuit involving state law that was brought before a federal Bankruptcy Court" is an abuse of the Bankruptcy Code); *In re Panache Dev. Co., Inc.*, 123 B.R. 929, 932 (Bankr.S.D.Fla.1991).

Courts have especially eschewed the use of a bankruptcy proceeding for resolution of a two-party dispute where the intent of the bankruptcy is perceived to be a relitigation of the prior action. *Donuts of Seekonk, Inc. v. Panagakos (In re Donuts of Seekonk, Inc.)*, 122 B.R. 172, 173 (Bankr. D.R.I.1990). Critical to courts as well has been the consideration of whether the particular debtor was an ongoing concern with both employees and the means to reorganize. *In re Sparklet Devices, Inc.*, 154

B.R. at 548–9. *See also In re Clinton Centrifuge, Inc.*, 72 B.R. 900, 908 (Bankr. E.D.Pa.1987) ("[p]rior to the filing, the debtor had an ongoing business, with several employees and several creditors other than the movants. The debtor's continued viability has been threatened by the claim successfully asserted in state court ... In these circumstances ... there is no basis to conclude that the case was filed 'with demonstrable frivolous purposes absent any economic reality,' or that 'reorganization process is being perverted in this case.' ").

## Actions To Transfer Assets Or Place Them Beyond The Reach Of Creditors

Actions by a debtor to transfer assets beyond the reach of creditors is frequently looked to by courts for finding a debtor in bad faith, whether or not the debtor is seeking to avoid the effects of a judgment. *In re Sletteland,* 260 B.R. at 664. *See also In re Edwards,* 140 B.R. 515, 520 (Bankr. W.D.Mo.1992) (case dismissed after finding that debtor had transferred assets on the eve of bankruptcy and had "no evidence of any realistic potential for reorganization"); *In re Primary Health Servs., Inc.,* 227 B.R. 479, 485–86 (Bankr. N.D.Ohio 1998) (no good faith in filing shown in creditor's motion for attorney's fees or sanctions where the debtor had "transferred assets away from itself to its parent company for the purpose of making itself uncollectible" and that "[a]bsent the transfers made by the debtor after the state court rendered its judgment, the debtor would have remained solvent").

Applying these principles to the instant matter, it appears Paolini's Chapter 11 petition was filed in subjective bad faith. A number of factors lead this Court to this conclusion.

The bankruptcy of Paolini is unquestionably a two-party dispute between Paolini and Albertsons. Paolini's sole secured creditor is the holder of the mortgage on his personal residence, an indebtedness which has been and continues to be paid by Paolini. The unsecured creditors of Paolini, besides Albertsons, are insignificant; American Express and the Albertsons Federal Credit Union are owed a total of $135.95 and obviously could easily be paid by Paolini. The other unsecured claim is that of his counsel, Mr. Telfeian, who was owed $10,000.00. but not only was not pressuring Paolini for payment but had to be pressed by Paolini to even bill for his services. The claim of Albertsons is substantial, but it constitutes the only adverse creditor of Paolini. The dispute with Albertsons can and will ultimately be resolved in the federal courts of the Ninth Circuit Court of Appeals. Paolini has an adequate forum to assert his claim against Albertsons and to adjudicate the correctness of the rulings of the District Court in the Idaho Litigation. But for the dispute with Albertsons, Paolini certainly would not need to avail himself of the bankruptcy process.[22]

Paolini's sole motivation in filing the instant petition appears to be the invocation of a stay of the collection efforts of the Albertsons' judgment that was denied by the District Court in the Idaho Litigation. Had Paolini been successful in persuading the District Court to grant a *supersedeas* without the posting of bond, there would be no proceeding here. In essence, what Paolini seeks is an ability to litigate his appeal before the Ninth Circuit Court of Appeals outside of the conditions found to be appropriate by the District Court. The District Court in a reasoned finding con-

---

**22.** Paolini appears to believe that after the Ninth Circuit Court of Appeals rules on his appeal in the Idaho Litigation, he will not need to be in bankruptcy. Tr. at 69, 70.

cluded that Paolini should not be entitled to stay the collection efforts of Albertsons without the posting of bond. To permit this bankruptcy to continue is tantamount to a negation by this Court of the reasoning of the District Court. Paolini has not provided adequate basis for this Court to nullify the reasoned conclusion of the District Court that no *supersedeas* should be issued in the Idaho Litigation without the posting of bond.[23] Paolini's circumstances here also distinguish the instant proceeding from others where a debtor was permitted to continue in bankruptcy for the purpose of thwarting execution on a large judgment. Here Paolini does not operate a business which would be disrupted should the bankruptcy case not proceed. While it is doubtless that should Albertsons resume their efforts to collect the judgment obtained in the Idaho Litigation it will have a negative impact on Paolini's personal finances, there would be no resulting loss of an operating business and its secondary economic efforts on customers and employees.

Part of the circumstances convincing this Court of Paolini's subjective bad faith in filing the instant petition is the seeming lack of sincerity of his reorganization efforts. Paolini has claimed as exempt virtually all of his assets as tenants by the entirety, including automobiles, investment accounts and what appears to be virtually every item of personal property owned, including artwork, household furnishings and sports and exercise equipment. While the Court need not reach the merits of the Objection to Exemptions of Albertsons challenging this blanket assertion of exemption because of its conclusion here, this assertion of exemption by Paolini is the broadest and most unsupported ever seen by this Court in an individual filing. It smacks of Paolini's lack of intent to seriously reorganize and speaks volumes of his true purpose of utilizing this proceeding not as an honest attempt to reorganize his debt but simply as an extension of his litigation tactics in the Idaho Litigation.

This assessment is further buttressed by the evidence of Paolini's lifestyle and the lack of any evidence of an attempt by Paolini to utilize the bankruptcy process as a vehicle to reduce his expenditures to facilitate payment of his creditors. Despite Paolini's protestations of the substantial diminution of his lifestyle since leaving the employment of Albertsons, Paolini continues to lead a lifestyle which would be envied by most. Paolini testified his lifestyle had diminished since filing of bankruptcy; the evidence clearly proves to the contrary, as the Paolini's continue to maintain their expenses at a level coincident with their substantial prepetition expenditures. There is no manifestation of a serious, *bona fide* attempt to reorganize Paolini's personal finances.

The Plan proposed by Paolini also betrays the lack of serious commitment to reorganize. Paolini's Plan is largely predicated on his speculation that he will not only succeed in reversing the District Court in the Idaho Litigation, but that after such reversal he will be awarded substantial monies against Albertsons. His hedge against his anticipated success in the reversal of the District Court is to pay to Albertsons what in comparison to

---

**23.** One of the express concerns of the District Court in denial of Paolini's request for a *supersedeas* without bond was Paolini's failure "to propose any plan whatsoever to provide adequate alternative security that would preserve even his current ability to satisfy the judgment." Albertsons Ex. 2. The District Court's concerns appear to be well-founded as Mrs. Paolini's testimony at the hearing on the Motion to Dismiss established that the monies transferred by her shortly before Paolini's bankruptcy from the Edwards Account and the Liberty Account have been almost completely dissipated.

his assets and annual income is a very small sum.[24] For these small and presumptively relatively painless payments, Paolini seeks to be able to continue his litigation with Albertsons without any risk of enforcement of Albertsons' judgment in the interim.

Were the efforts here of Paolini more sincerely motivated to deal forthrightly with Albertsons claim, perhaps this Court might be less inclined to find Paolini's filing to have been done in bad faith. Instead, the Court is confronted with Paolini's attempt to continue the appeal of the Idaho Litigation in a manner contrary to the conditions imposed by the District Court and to postpone any material effort to reorganize until he has had the benefit of a stay of Albertsons collection efforts without any material financial sacrifice. Paolini's Plan provides minimal payments during his appeal to the Ninth Circuit Court of Appeals while Paolini retains all of his substantial assets except for a Rolex watch earlier given him by Albertsons and the approximately $22,000.00 in cash sur-render value of two life insurance policies. The monthly payments proposed by Paolini into the Plan are *de minimis* compared to the substantial non-essential personal living expenditures which Paolini made prior to bankruptcy and continues to incur since filing his petition in this Court. Paolini's only sincere plan to financially reorganize is to reverse the adverse ruling of the District Court and prevail on his claims against Albertson's. There is no good faith attempt on the part of Paolini to utilize the bankruptcy process for the legitimate purpose of reorganizing his personal finances; rather, the totality of the circumstances here convince this Court that Paolini filed his case solely to evade the decision of the District Court to not permit him a *supersedeas* without the posting of bond. The dispute between Paolini and Albertsons is fundamentally one of two parties that is best resolved among the courts of the Ninth Circuit Court of Appeals. As such, this Court finds Paolini filed his petition here in subjective bad faith.[25] It remains, then, to

---

**24.** The Plan proposed Paolini is to initially pay six percent of his normal take-home pay for three years and $3,600.00 of his 2003 bonus and fifteen percent (15%) of any bonuses for three years. Based upon the exhibited statement of income of Paolini from the current employer (Albertsons Ex. 23), Paolini's proposal for each of the three years of his Plan is to pay from his monthly take-home income $8,638.37 or $719.86 each month. This amount is less than the Paolini's budgeted monthly amount for recreation, clubs and entertainment, newspapers, magazines, etc. ($739.50), cable/internet, family cell phones, children's activities and housekeeper ($113.00 + $230.00 + $200 + $200 = $740.00), or Mrs. Paolini's credit cards ($800.00). Based on his 2003 bonus, Paolini would pay into his Plan annually for three years fifteen percent of his bonus or $8,848.20, assuming the fifteen percent (15%) is calculated based on the gross amount of Paolini's bonus and not the net amount, which is unclear from the Plan. These annual payments combined would total

$17,480.57. The Plan provides that the difference between these amounts and fifteen percent (15%) of the claim of Albertsons would ultimately be paid by Paolini from his 401K Plan or a refinance of his personal residence, after liquidation of Paolini's Rolex watch and cash-in of his whole life insurance policies. While the Plan is not entirely clear, it appears this substantial difference would not be paid until after the expiration of the three (3) year period, presumably after the Idaho Litigation has been finally concluded.

**25.** Albertsons also heavily relies upon the transfers of the monies in the Edwards Account and the Liberty Account as evidence of Paolini's subjective bad faith. Based on the evidence adduced at the hearing on the Motion to Dismiss, the Court cannot conclude that Paolini knew of or participated in these transfers. It is clear that, after the transfers, he acquiesced in the removal of these monies from these joint accounts into an account solely in Mrs. Paolini's name. However, be-

analyze whether the reorganization efforts of Paolini are objectively futile.

## IV.

### Objective Futility

■ *Carolin Corp.* requires not just a finding of the existence of subjective bad faith in the filing of a Chapter 11 petition by a debtor, but additionally there must exist an objective futility in the case convincing the assessing court of the futility of the reorganization process. *Carolin Corp.,* 886 F.2d at 701–2. One of the difficulties in assessment of the objective futility prong in the context of the instant matter is the paucity of bad faith dismissal decisions which have been called upon to assess objective futility in the context of an individual debtor such as Paolini. Many of the decisions among the courts of the Fourth Circuit Court of Appeals have measured objective futility in the context of an entity owning a single real estate asset attempting to thwart an eminent foreclosure such as found in *Carolin Corp. See In re Dunes Hotel Assocs.,* 188 B.R. 162, 166 (Bankr.D.S.C.1995); *In re AMA Corp.,* 175 B.R. 894, 898–9 (Bankr.W.D.Va.1995); *In re Delray Assocs. Ltd. P'ship,* 212 B.R. 511, 513 (Bankr.D.Md.1997); *In re Yachting Connections, Inc.,* 1992 WL 372947 at *2 (4th Cir.1992) (unpublished).

Relatively few cases among the courts of the Fourth Circuit have addressed the issue of objective futility in the context of an individual debtor.[26] *See Wharton v. Internal Revenue Service,* 213 B.R. 464 (E.D.Va.1997); *In re Coleman,* 275 B.R. 763 (Bankr.W.D.Va.2002); *In re Kent,* 145 B.R. 840 (Bankr.E.D.Va.1991). In *Wharton,* the court found the record established there was little or no hope of rehabilitation. There the debtor had only one creditor at the time of filing which was the Internal Revenue Service that was owed nearly $800,000.00. The debtor had been unsuccessful in an earlier Chapter 11 filing. In assessing the likelihood of a successful rehabilitation, the court concluded the debtor's specific financial circumstances and the continuing objection of the Internal Revenue Service made a reorganization impossible.

The financial realities surrounding his most recent petition apparently mirrored the situation when Appellant filed his 1995 Chapter 11 petition. And once again, Appellant filed a proposed offer of settlement identical to the one previously dismissed despite the continuing objections of the IRS.

Indeed, Appellant's tax obligations, Appellant's sole debt as listed in the petition, was non-dischargeable and had to be paid, in full, within a six–year period. *See* 11 U.S.C. § 1129(a)(9)(C). Appellant admitted previously that he is unable to satisfy the entire debt and no evidence has surfaced that these circumstances changed in any material way in the time since Appellant's previous petition was dismissed for failure to confirm a plan for reorganization. In light of the IRS's continuing objections to Appellant's proposed offer of settlement

---

cause of the absence of any proof Paolini knew of or directed or participated in these transfers, these events do not influence the Court in its conclusion that Paolini filed his petition in subjective bad faith.

**26.** The Supreme Court in *Toibb v. Radloff,* 501 U.S. 157, 111 S.Ct. 2197, 115 L.Ed.2d 145 (1991) sanctioned the use of Chapter 11 by individual debtor in holding that the plain language of the Bankruptcy Code permitted an individual with no ongoing business to avail himself of the advantages of Chapter 11. *Id.* at 166, 111 S.Ct. 2197. Such a conclusion that an individual not engaged in business is eligible for Chapter 11 does not preclude the consideration by this Court as to whether the petition of Paolini was filed in good faith.

the objective futility of the plan was clear from the time it was filed.

*Id.* at 466–67.[27]

Judge Stone in *In re Coleman* confronted substantially dissimilar facts to those considered by Judge McKenzie in *Wharton.* In *Coleman,* the individual debtor failed to attempt to set aside two deeds of trust, to seek relief from a substantial debt owed to the Internal Revenue Service as an "innocent spouse," and to liquidate as much of her property as necessary to pay the Internal Revenue Service and her other creditors and ultimately to retain a portion of her property after satisfying creditor claims. *Id.* at 767. In denying the motion to dismiss, the Court there concluded the continuation of the debtor's case would not be an abuse of the purposes of the bankruptcy system as the debtor, if successful in her avoidance of the encumbrances on her property and in the assertion of her "innocent spouse" defense, would be able to benefit her other creditors in the case.[28]

The Plan filed by Paolini subsequent to the hearing on the Motion to Dismiss well illustrates the futility of the reorganization efforts of Paolini at this time. The Plan seeks to create an impaired class to presumably accept the Plan by establishing a separate class of unsecured creditors composed only of the claim of Albertsons. The purported basis for this separate class is the disputed nature of the Albertsons claim. The other class of unsecured creditors consists of two small creditors and the claims of the two attorneys who either previously or are currently assisting Paolini in his appeal of the adverse ruling of the District Court in the Idaho Litigation.[29] Even if the Nanette Joslyn claim is not valid, the claim of Paolini's other counsel dominates the class and presumptively, along with the insignificant claims of American Express and the Albertsons Federal Credit Union, would deliver the affirmative vote of an impaired class necessary for the Court to consider confirmation of the Plan without its acceptance by Albertsons. *See Travelers Ins. Co. v. Bryson Properties, XVIII (In re Bryson Properties, XVIII),* 961 F.2d 496, 501 (4th Cir. 1992) ("Before a plan can be crammed down, at least one noninsider impaired class of claims must vote to accept it"); 11 U.S.C. §§ 1129(a)(10), 1129(b)(1)(2003). However, this attempt to so classify his unsecured claims is not permissible and illustrates why the current reorganization effort of Paolini is objectively futile.

The classification of the unsecured claims by creating a separate class solely consisting of disputed unsecured claims is an attempt by Paolini to gerrymander the

---

27. One decision of a court of the Fourth Circuit in a non-individual filing suggests that a "[r]eorganization cannot be predicated on a two-party dispute" where the debtor has scheduled but one debt. *In re William Steiner, Inc.,* 139 B.R. 356, 358 (Bankr.D.Md. 1992).

28. The other decision of a court of the Fourth Circuit considering application of the principles of *Carolin Corp.* in the context of individual debtors is also substantially factually dissimilar from the instant matter. In *In re Kent,* 145 B.R. 840, (Bankr.E.D.Va.1991), the debtor had filed a previous unsuccessful Chapter 11 and intended to partially fund his reorganization by a suspect sales contract to fund the payment of his creditors in his second Chapter 11 filing. This Court concluded the case was filed in subjective bad faith and was objectively futile.

29. As aforedescribed, it does not appear to this Court that Nanette Joslyn, Esquire actually holds a valid pre-petition claim against Paolini, as the evidence at the hearing on the Motion to Dismiss showed the monies advanced by Paolini to Ms. Joslyn as a retainer and/or advance payment exceed the pre-petition claim of Ms. Joslyn for professional services.

voting process to obtain a consenting class despite the overwhelming economic dominance of the claim of Albertsons. Albertsons has stated it will not support a reorganization plan proposed by Paolini which pays less than the full amount of Albertsons' claim. Albertsons Ex. 35 [30] The Plan contains only two classes of impaired creditors. Accordingly, if Albertsons' claim must be included in the same class as the other unsecured creditors consisting of the claims of American Express, the Albertsons Federal Credit Union, and Paolini's two attorneys, the affirmative vote of the sole impaired class cannot be obtained and there is no legal basis upon which the Plan may be confirmed by this Court. [31]

The separate classification of the Albertsons' claim is not permissible. 11 U.S.C. § 1122 pertains to classification of claims

**30.** In the deposition testimony of Charles F. Cole, group Vice President of Litigation and Regulatory Affairs for Albertsons, Mr. Cole testified as follows:

Q. In looking over the transcript did you have occasion to read what Mr. Paolini and his attorney proposed on a preliminary basis for a plan of reorganization?
A. Yes, I did.
Q. And what do you understand of— well, you read in the plans—you read in the transcript, then, that he is proposing to pay the value of his nonexempt assets into the estate?
A. That's right, Mr. Glanzer. I understood that he and his attorney proposed a one-time payment of his nonexempt assets into the estate.
Q. And you also understand that Mr. Paolini was not proposing to commit any future earnings to the pan?
A. Yes. That's my understanding.
Q. And that he was also planning to keep his assets?
A. Yes, That's my understanding.
Q. Would Albertsons vote in favor of such a plan?
A. No, we would not.
Q. What is Albertsons looking for in terms of plans for this Chapter 11 before it could vote in favor of confirmation?
A. Mr. Glanzer, we deserve and expect to be fully paid for the full amount of the judgments that we have and the attorney's fees that we will be awarded.
Q. All right. Mr. Cole, would Albertsons vote in favor of a plan which included a contingency based upon the outcome of the appeals in the Ninth Circuit?
A. No, we would not.
Albertsons's Ex. 35.

**31.** 11 U.S.C. § 1126 provides in pertinent part:

(c) A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

(d) A class of interests has accepted a plan if such plan has been accepted by holders of such interests, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount of the allowed interests of such class held by holders of such interests, other than any entity designated under subsection (e) of this section, that have accepted or rejected such plan.

(e) On request of a party in interests, and after notice and a hearing, the court may designate any entity whose acceptance or rejection of such plan was not in good faith, or was not solicited or procured in good faith or in accordance with the provisions of this title.

(f) Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

(g) Notwithstanding any other provision of this section, a class is deemed not to have accepted a plan if such plan provides that the claims or interests of such class do not entitle the holders of such claims or interests to receive or retain any property under the plan on account of such claims or interests.
11 U.S.C. § 1126(c)-(g) (West 2003).

and interests under a reorganization plan and provides:

> (a) Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.
>
> (b) A plan may designate a separate class of claims consisting only of every unsecured claim that is less than or reduced to an amount that the court approves as reasonable and necessary for administrative convenience.

The Fourth Circuit Court of Appeals considered the limitations of § 1122 of the Bankruptcy Code in *Bryson Properties, XVIII*:

> Section 1122 requires substantial similarity between claims that are placed in the same class. It does not, however, require that all substantially similar clams be placed within the same class, and it grants some flexibility in classification of unsecured claims.
>
> . . . . .
>
> Thus, although separate classification of similar claims may not be prohibited, it "may only be undertaken for reasons independent of the debtor's motivation to secure the vote of an unimpaired, assenting class of claims."

*Id.* at 501 (quoting *In re Greystone III Joint Venture*, 995 F.2d 1274, 1279 (5th Cir.1991)). In *Bryson Properties, XVIII*, the attempted classification of natural and unnatural unsecured recourse claims was "clearly for the purpose of manipulating voting" and not permitted under 11 U.S.C. § 1122. *Id.* at 502.

Courts who have considered whether disputed claims may be properly classified separately from undisputed claims of a similar nature have concluded the existence of a dispute over claim validity does not support a separate classification. *In re ARN LTD. Limited P'ship*, 140 B.R. 5, 13–14 (Bankr.D.D.C.1992) ("[t]hat the claims are disputed, however, is not a justification for the discriminatory treatment"); *In re Mastercraft Record Plating, Inc.*, 32 B.R. 106, 108 (Bankr.S.D.N.Y. 1983), *rev'd on other grounds*, 39 B.R. 654 (S.D.N.Y.1984) ( [g]eneral unsecured claims are alike, whether they are disputed or not, whether over or under $20,000.00"); *In re Midway Investments, Ltd.*, 187 B.R. 382, 392 (Bankr.S.D.Fla.1995) ("[the debtor's] separate classification of disputed unsecured claims is an attempt to gerrymander the voting process to facilitate the affirmative vote of an impaired class of claims and thereby satisfy Section 1129(a)(10)"); *In re Weiss–Wolf, Inc.*, 59 B.R. 653, 655 (Bankr.S.D.N.Y.1986); *In re Curtis Center Ltd. P'ship*, 195 B.R. 631, 642 (Bankr.E.D.Pa.1996) (debtor's separate classification of disputed unsecured deficiency claim from other undisputed unsecured claims was improper as "there is no difference between the legal characteristics of [the creditor's] unsecured deficiency claim and the claims of the Debtor's other unsecured creditors, simply because [the creditor's] unsecured deficiency claim is the subject of pending litigation" as "[u]nsecured claims are basically all alike, whether they are disputed or not").

▪ Here the separate classification of the claim of Albertsons appears to be solely to attempt to artificially create a separate accepting impaired class controlled by Paolini's various counsel in the Idaho Litigation. There is no cognizable basis to permit the separate classification of the claim of Albertsons; the existence of the dispute over the validity of the Albertsons claim is not sufficient to distinguish it from the other unsecured pre-petition claims of

Paolini.[32]

As the separate classification of the claim of Albertsons is without justification, the Plan is without hope of confirmation. Albertsons has indicated it will not consent to a reorganization plan of Paolini which does not pay its claim in full. Albertsons Ex. 35. Given the economic dominance of Albertsons' claim, there appears to be no opportunity for Paolini to craft a plan of reorganization with an accepting impaired class, which precludes any possibility of this Court confirming a plan of organization for Paolini over the objection of Albertsons. As such, Paolini's efforts to reorganize under Chapter 11 of the Bankruptcy Code given his present composition of creditors is doomed to failure. With the certainty of this fate, it is pointless to attempt confirmation of the existing Plan and this Court can now conclude that the reorganization attempts of Paolini are futile.

In assessing the totality of the circumstances here, this Court must conclude that the real motivation of Paolini is "to abuse the reorganization process" and "to cause hardship or delay creditors by resort to the Chapter 11 devices merely for the purpose of invoking the automatic stay, without an intent or ability to reorganize his financial activities." *Carolin Corp.*, 886 F.2d at 702 (quoting *In re Thirtieth Place, Inc.*, 30 B.R. 503, 505 (9th Cir. BAP 1983.)) Furthermore, there is not be found in Paolini's petition "some relation to the statutory objective of resuscitating a financially troubled [debtor]." *Id.* at 701 (quoting *In re Coastal Cable TV, Inc.*, 709 F.2d 762, 765 (1st Cir.1983)). As such, grounds exist to conclude that Paolini's petition was not

---

**32.** While not proposed in the Plan, it also appears that a modification of the Plan to classify the unsecured creditors other than Albertsons as a separate unsecured class for administrative convenience pursuant to 11 U.S.C. § 1122(b) would also be unsuccessful. Use of an administrative convenience class may not be used to create an accepting class of creditors. *In re S & W Enterprise*, 37 B.R. 153, 162–63 (Bankr.N.D.Ill.1984). As Judge DeGunther explained:

First, it is "necessary" for administrative convenience to split [the debtor's] three unsecured claims into two classes? The Court finds that "necessary" in the context of Section 1122(b) means something more than just tending to ease the administrative burden. Treating the unsecured claims as members of the same class must be truly burdensome before a bankruptcy court should consider deviating from the general rule and classifying them separately. In this case the Court finds that a negligible administrative burden, and thus no necessity, exists. There are, after all, only three unsecured claimants, two of which comprise only $850 in claims. The complexity of dealing with these claims is not exactly mind-boggling.

Even in a case where a bankruptcy court finds that separating unsecured claims into separate classes is to some extent necessary, the proposed classification scheme must still pass the reasonableness test in order to gain court approval. Thus the Court must determine whether the proposed classification is a "reasonable" means of achieving the goal of promoting administrative convenience. A balancing is required between the administrative benefits achievable under the proposed unsecured creditor classification scheme and the negative effects the scheme renders upon other entities and Code policies. Here, the Court finds that not only is the separation of clams unnecessary to promote administrative convenience, it falls decisively short of being "reasonable." To hold otherwise would be to make worthless Code provisions such as Section 1129(a)(10) and to render meaningless the placing by Congress of the terms "reasonable" and "necessary" in Section 1122(b). In short, the Debtor's creation of separate unsecured classes is a fiction born of the necessity to satisfy Section 1129(a)(10).

*Id.* Thus, this avenue of creation of a separate accepting impaired class for administrative convenience is not available to Paolini and further illustrates his inability to effectuate a confirmable plan of reorganization.

filed in good faith and is subject to conversion or dismissal.

## V.

### Conversion or Dismissal

■ Having concluded that the Chapter 11 petition of Paolini has been filed in bad faith and that cause exists pursuant to 11 U.S.C. § 1112 to dismiss this case, it remains to conclude whether the case should be dismissed or converted to a proceeding under Chapter 7 of the Bankruptcy Code. *See Rollex Corp. v. Associated Materials (In re Superior Siding & Window, Inc.),* 14 F.3d 240, 242 (4th Cir.1994) ("A motion filed under this section [1112(b)] invokes a two-step analysis, first to determine whether 'cause' exists either to dismiss or to convert the Chapter 11 proceeding to a Chapter 7 proceeding, and second to determine which option is in 'the best interest of creditors and the estate'"). At oral argument on the Motion to Dismiss, Albertsons for the first time urged the Court to convert this case rather than dismiss it. Albertsons' change of position was apparently provoked by its desire to preserve the transfers made by Mrs. Paolini from the Edwards Account and the Liberty Account for possible recapture by a Chapter 7 trustee.

11 U.S.C. § 1112(b) commands this Court to consider in electing conversion or dismissal "whichever is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b) (West 2003). Judge Niemeyer has provided guidance as to proper analysis of a determination of the best interests of the creditors and the estate:

> Once a court turns to the second question of determining what is in the best interest of creditors and the estate, it

must ascertain the impact on the creditors and on the estate of each of the options. Thus, it has been noted that the inquiry for this element cannot be completed without comparing the creditors' interests in bankruptcy with those they would have under state law. Moreover, in evaluating the interests, the court must consider the interests of all of the creditors.

*In re Superior Siding & Window, Inc.,* 14 F.3d at 243. (footnote omitted).

Here the fundamental factual consideration in either dismissing this cause or converting it to a proceeding under Chapter 7 of the Bankruptcy Code lies in the two party nature of the dispute between Paolini and Albertsons. The sole secured prepetition creditor of Paolini is the holder of his mortgage on his personal residence, who is being paid currently and apparently will continue to be paid in accordance with their agreed contractual terms whether Paolini is within the protection of the Bankruptcy Court or not. The unsecured creditors of Paolini other than Albertsons likewise appear to be certain to be paid in full without regard to Paolini's continuation in Chapter 7. Two of the creditors are *de minimis;* [33] the third is one of Paolini's attorneys assisting him in the Idaho Litigation who is owed approximately $10,000.00. Paolini's ample income makes it certain that these creditors will be paid in full and would have been paid some time ago but for the timing of the filing of Paolini's petition here. If the case is converted, their payment would await liquidation of Paolini's non-exempt assets by a Chapter 7 trustee and any payment would be substantially later than if Paolini's case was dismissed. For these reasons, the creditors of Paolini other than Albertsons

---

**33.** American Express is owed $21.95 and the Albertsons Federal Credit Union is owed $114.00.

would be best served by a dismissal of this petition.

The interests of Albertsons also appear to be best served by dismissal. Albertsons is in essence the only unsecured creditor of Paolini. The principal basis asserted in support of its advocacy of conversion is the preservation and potential avoidability of the transfers from the Edwards Account and the Liberty Account which Albertsons believe were fraudulent. Conversion of the case would permit a Chapter 7 trustee to investigate and possibly seek avoidance of these transfers. However, even if successful, the sole creditor to receive any substantial benefit of this potential avoidance is Albertsons. Moreover, the evidence before the Court is that these monies have been expended and only $2,600.00 of the original *res* remains. While if avoided, Mrs. Paolini would be liable for the value of the interest of Paolini transferred, but Albertsons already is asserting substantial claims against Mrs. Paolini in the District Court. Tr. at 193–194. Albertsons claims against Mrs. Paolini apparently are being actively litigated and, if successfully asserted, Albertsons will be entitled to enforce its judgment against any non-exempt assets of Mrs. Paolini. Here the principal goal of the bankruptcy process of equality of distribution may not be achieved. *See In re Superior Siding & Window, Inc.*, 14 F.3d at 243 ("[w]e believe that this policy of equality among creditors, fundamental to the bankruptcy law, is one of the factors to be considered in determining the 'best interest of the creditors' under § 1112(b), and it is not served by merely tallying the votes of the unsecured creditors and yielding to

the majority interest"). There do not appear to be any potential preferential transfers pursuant to 11 U.S.C. § 547 subject to recovery by a Chapter 7 trustee here. Additionally, if the case is dismissed, Albertsons would retain whatever rights it has under state law to potentially set aside the transfers from the Edwards Account and the Liberty Account made by Mrs. Paolini, and its right to attempt to collect the judgment it obtained in the Idaho Litigation from the future income of Paolini unless the District Court's decision to award judgment is reversed. While Albertsons now advocates conversion, it appears to the Court that its interests are best promoted by the dismissal of this petition.

Finally, the interest of the estate likewise appears to be better served by dismissal. If the Idaho Litigation is favorably resolved, as Paolini believes it ultimately will be, any need for bankruptcy protection by Paolini is negated and the administration and liquidation of Paolini's estate by a Chapter 7 trustee would be premature and needless. Forcing the issue of liquidation of Paolinis assets prior to the conclusive and final resolution of the claim of Albertsons against Paolini is contrary to Paolini's interests.[34] If this case is dismissed Paolini may be required to defend against Albertsons' efforts to enforce its judgment which Paolini sought to thwart by filing under Chapter 11, but this malady is lesser than initiating the immediate liquidation of his non-exempt assets.[35] Having considered the interests of all the prepetition creditors and the bankruptcy estate of Paolini, the

---

**34.** Paolini also testified he is seeking other employment which would compensate him comparably to his former Albertsons position, which, if obtained, likewise might negate his need for bankruptcy protection.

**35.** As noted previously, Paolini has claimed virtually all of his assets as exempt. As Virgi-

nia has elected to opt out of the federal exemptions in 11 U.S.C. § 522, the exemptions asserted by Paolini are founded under Virginia state law. Should his case be dismissed, Paolini could continue to assert these exemptions defensively against the collection efforts of Albertsons.

Court concedes, pursuant to 11 U.S.C. § 1112(b), that this case should be dismissed.

### Conclusion

The bankruptcy petition of Paolini was filed in subjective bad faith and his effort to reorganize is objectively futile. Cause exists pursuant to 11 U.S.C. § 1112 of the Bankruptcy Code to dismiss the petition. Accordingly, the Motion to Dismiss of Albertsons is granted. A separate Order will be issued dismissing the case.

### *ORDER DISMISSING CASE*

For the reasons stated in that certain Memorandum Opinion issued in this case on June 1, 2004, it is ORDERED the Motion to Dismiss of Albertsons, Inc. Is granted and this case is dismissed.